RUTHERFORD ET AL., APPELLANTS, *v.* LONG & CO., RESPONDENT.

(No. 5,769.)

(Submitted October 22, 1925. Decided November 2, 1925.)

[240 Pac. 821.]

*Cancellation of Instruments — Findings — When Conclusive — Findings by Jury Advisory Only.*

Equity—Findings of Jury Advisory Only.
    1.   The findings of the jury in an equity case are merely advisory to the court and it may set them aside and make findings of its own.
Same—Findings of Court Conclusive, When.
    2.   The findings of the trial court will not be set aside unless the evidence clearly preponderates against them.
Same—Immaterial Findings Do not Affect Decree.
    3.   Immaterial findings of the trial court not warranted by the proof do not affect the decree.
Cancellation of Instruments—Deed Given as Mortgage — Payment — Evidence—Insufficiency.
    4.   Under the above rules, *held* in an action to cancel a deed to real property given as a mortgage to secure payment of a promissory note in which the defense was that the indebtedness had been paid, a find-

ing, contrary to that made by the jury, that the debt had not been paid, was sustained by the evidence, and that judgment of dismissal was proper.

---

Appeal and Error, 4 C. J., sec. 2857, p. 887, n. 59.
Equity, 21 C. J., sec. 735, p. 596, n. 88.
Judgments, 33 C. J., sec. 106, p. 1172, n. 52.
Trial, 38 Cyc., p. 1937, n. 89; p. 1938, n. 92.

*Appeal from District Court, Cascade County; H. H. Ewing, Judge.*

ACTION by J. A. Rutherford and wife, against J. B. Long & Co. From a judgment of dismissal plaintiffs appeal. Affirmed.

Cause submitted on briefs of Counsel.

*Messrs. Judson & Hartman,* for Appellants.

*Messrs. Cooper, Stephenson & Hoover,* for Respondent.

MR. JUSTICE GALEN delivered the opinion of the court.

This action was instituted by J. A. Rutherford and Molly Rutherford, his wife, against J. B. Long & Co., a corporation, to cancel a deed of certain real property given as a mortgage to secure the payment of the promissory note of their sons, Charles and Harry Rutherford, made payable to the defendant, dated January 17, 1921, for the sum of $5,920.27, with interest at eight per cent per annum; it being alleged in the complaint that such indebtedness has been fully paid, and in consequence the plaintiffs are entitled to have the security returned and discharged of record.

By its answer the defendant denies payment of the indebtedness, and affirmative matters are pleaded. Issue was joined by plaintiff's reply. The cause was regularly brought on for hearing before the court, sitting with a jury. At the outset of the trial the court limited the issues alone to the question of whether the indebtedness had been paid. At the conclusion of all of the testimony, one special finding was

submitted by the court to the jury as follows: "Did the defendant agree to accept the Jack Galbreath note for the sum of $2,685 for its full face value, and agree to credit said amount on the $5,920.27 note secured by the real estate mortgage mentioned in the complaint?" The jury made answer thereto in the affirmative, and on motion the jury's finding was set aside, and the court made its own findings of fact as follows: That the promissory note for which the real estate mortgage was given "has never been paid or discharged; that the defendant did not accept the Jack Galbreath note for the sum of $2,685, for its full face value, and did not agree to credit said amount on the $5,920.27 note secured by the real estate mortgage mentioned · the complaint; that there is no evidence that any officer or agent of the defendant corporation was ever authorized to accept payment of said promissory note in any other medium than cash or its equivalent." From these facts the court concludes as a matter of law that the defendant is entitled to hold the parcels of land described in the complaint, and the deed referred to therein, as security for the amount remaining unpaid upon the note of Charles and Harry Rutherford, dated January 17, 1921, "and that the plaintiffs have established no cause of action against the defendant, and that the complaint in the action should be dismissed; that the defendant should be given judgment for its costs." Judgment was entered accordingly, and the appeal is from the judgment.

The assignments of error present for our consideration the sole question as to whether or not the findings of the court, made the basis of the judgment, should be disturbed.

It appears that Charles and Harry Rutherford, as partners, were conducting an automobile sales business in the city of Great Falls under the name and style of the "Treasure State Motor Company," handling the agency for and making sales of the "Holmes automobile." The mortgage indebtedness involved herein was created March 11, 1921, by reason of the

fact that the defendant, on January 17, 1921, had advanced to them $5,920.27, on their joint promissory note, for the purchase of two such cars. Prior to the date of the execution of such real estate mortgage the dealers named were indebted to the defendant on another promissory note, dated February 2, 1920, in the sum of $5,265.17 for money loaned with which to make purchase of two other "Holmes cars." At the time of the execution of the note representing the indebtedness involved in this action, January 17, 1921, the partnershsip executed a chattel mortgage, covering all four of the automobiles, for which the defendant had advanced them the money with which to purchase the same, and the real estate mortgage involved was merely additional security for the payment of the second note.

The first of the last two cars purchased by the partnership was sold to one Charles Buck of Browning. The date is not disclosed, but it was some time prior to a later sale made to Jack Galbreath July 9, 1921. Mr. Buck called at the place of business of the partnership, and said that he would take the car; that J. B. Long & Co., would handle his paper. Harry Rutherford then called the office of that company by telephone, and talked with the vice-president thereof, J. J. Baucus, who said: "It was all right to turn the car over to Mr. Buck; he had fixed it all up with Mr. Buck." Roy Clary, the president of the defendant company, thereafter told Harry Rutherford to drive the car to Browning, which he did, accompanied by Mr. Buck. In exchange for this car a note was taken, payable to and delivered to the defendant, which has since been paid to it and credit allowance of the full amount given to the partnership on the indebtedness involved in this action. The amount of the note is not clearly shown, but the payments thereon in satisfaction thereof appear to amount in the aggregate to $4,201.47. It was not fully paid until May 1, 1923.

After the sale and delivery of the car to Mr. Buck, Mr. Buck called Harry Rutherford by telephone from Browning, and talked with the latter at Great Falls, advising of the

possibility of making a sale of another "Holmes automobile" at Browning. Roy Clary, the president of the defendant company, was then consulted, and advised Harry Rutherford to take a car to Browning to Mr. Buck; "that Mr. Buck had a sale for the car; * * * that whatever Mr. Buck done was all right with him." He testified: "I was helping them make any sales I could in a general way, and Charles Buck called me up from Browning, and told me he thought if Harry Rutherford would take one of these big cars up there he might make a sale of it. He did not tell me to whom he might make a sale or give any details. I called up Harry Rutherford, and told him Charley Buck had called me up, and told me he might make a sale at Browning. I said to him he might take a car to Browning, and told him he might possibly make a sale, but I did not tell him to whom the car might be sold. I told him anything that Mr. Buck told him would be honest."

Harry Rutherford took the car, and went to Browning, where he reported to Mr. Buck. Subsequent negotiations resulted in the sale of the second of these automobiles to one Jack Galbreath of Browning on July 9, 1921, in exchange for a used "Cole car," and Galbreath's promissory note of that date, payable to "J. B. Long & Co., Inc." for $2,630. This note was then taken by the partners and delivered to the defendant at its office in Great Falls. It is claimed that J. J. Baucus, vice-president of the defendant company, at that time agreed to accept the Galbreath note in settlement of the indebtedness secured by the real estate mortgage, and evidence appears in support thereof. Charles Rutherford testified that he took the Galbreath note to the office of the defendant, and gave it to Mr. Baucus, and that thereupon the following conversation ensued: "I told him there was the note from Jack Galbreath for the sale of that car, and this note and the sale of the car more than paid our note for the purchase of the two cars. He said it did, and he would mark my note 'paid,' or canceled, or something, and send it to me. He seemed pleased.

Everything was all right. He thought it was all right to do it." All this is denied by Mr. Baucus.

No evidence was offered as to the specific authority of Mr. Baucus as vice-president of the defendant company, in the absence of the president, otherwise or at all. Afterwards, the partnership paid to the defendant $1,100 from the proceeds derived from the sale of the "Cole car" taken in exchange from Galbreath, $594.35 of which was credited upon the indebtedness involved on August 18, 1922, and the remainder upon other partnership indebtedness. On November 22, 1921, the defendant took a chattel mortgage in its name from J. J. Galbreath on the "Holmes car," purchased by him, as security for the payment of the sum of $2,630, representing the balance of the purchase price, and at the same time took a renewal of the original note. The affidavit attached to this chattel mortgage to the effect that the mortgage was in good faith to secure the amount named without design to hinder, delay or defraud creditors, was made by R. F. Clary as president of the defendant company. Mr. Clary explains that the chattel mortgage was so obtained by him to protect the Rutherford boys in their transaction with Galbreath and at the same time to afford the defendant company better security for the indebtedness. Being asked as to whether or not the company ever accepted the note as payment, he said that it did not, and that he told the Rutherford boys repeatedly that it would not be accepted, but kept the same merely as additional security for the indebtedness involved in this action.

A short time prior to April 1, 1922, Mr. Clary had a conversation with the Rutherford boys at the office of the defendant company regarding the state of their indebtedness, at which Mr. Baucus and the plaintiff J. A. Rutherford were present. Mr. Baucus testified as to such conversation: "Q. Did they make any contention at that time that this note had been paid? A. No, sir. Q. In your discussion at that time with these people did you discuss this note as you did the other

obligations these boys owed J. B. Long & Co. at that time? A. Yes, sir." Mr. Clary stated, referring to the conversation had with the Rutherford boys, testified to by Mr. Baucus, with particular reference to the indebtedness involved in this action: "After this conversation in our office in going over the matters, we went up and searched the records to find out how they stood relative to these cars, Charley and Harry Rutherford, and then we found they had given a mortgage to their mother on their personal property down there in the shop, part of which property I considered had been gotten through us from another garage up here. When I found that out * * * I told him then that I had found out about this mortgage being given, and I didn't think that was the way to do business, and doing business that way shook my faith in him. * * * We told him we had found this mortgage on record to his mother, and we didn't think it was a square way of treating us after what we had done for him, to do that kind of business, and I asked him why he done it, and he wrote that letter." A day or two subsequently the defendant received the letter referred to from Harry Rutherford, which reads as follows: "I have been thinking over what you ask me about that mortgage we gave to mother, and I think I can answer it more clearly. From the talks we had with you up in your office previous to filing that mortgage you gave us to understand that you would close us out if you could come any ways near clearing yourself. And that would leave us without a place to do business or a chance to pay our debts. So that is the reason we give mother that mortgage simply to protect ourselves so we could get back on our feet. Dad and mother are back of us as far as they can go. Maybe we did wrong to give another mortgage, but that was the only way we could see our way out. We did not do it to be dishonest. We never thought of such a thing. But we did not think it was right to jump on us about those two cars that were sold last year; any way not until you were sure they would not be

payed for.  As near as we understand it we don't see any
reason to think they won't pay for them.  We started in this
game the wrong time; just when everything went to the bad,
and it put us in bad, and the only way to get out is to go
ahead and do the best we can, and if we cannot pay out this
year why try the next.  We will do the best we can, and that
is all anyone can do.''

The last credit given on the indebtedness involved was on
May 1, 1923, $2,522.62, the balance due on the Buck note, and
it is plain that as late as April 1, 1922, the date of the
letter set forth above, the Rutherford boys recognized full
responsibility to the defendant for the indebtedness involved,
notwithstanding the delivery to it of the Buck and Galbreath
notes.  This letter was written more than nine months after
the alleged payment of the indebtedness by the delivery to
the defendant and its alleged acceptance of the Galbreath
note.

The finding of the jury was merely advisory to the court,
[1-4]  and it was entirely within its province to set aside and
disregard the jury's view of the evidence.  Therefore we must
look alone to the findings made by the court and determine
therefrom whether they are supported by the evidence.  From
a review of all of the evidence, while conflict is to be found
therein, yet it cannot be said that the court's findings were not
fully warranted by sufficient evidence justifying its finding
that the indebtedness involved has not been paid.  It is the
settled rule in this state that the findings of the trial court
will not be set aside unless the evidence clearly preponderates
against them.  Citation of the numerous decisions of this
court, adhering to this oft-repeated doctrine, seems wholly
unnecessary.  The rule has been recently reaffirmed in *Bischoff*
v. *Bischoff,* 70 Mont. 503, 226 Pac. 508; *Dyk* v. *Buell Land Co.,*
70 Mont. 557, 227 Pac. 71; *Batchoff* v. *Melzner,* 71 Mont. 411,
230 Pac. 48; and immaterial findings made by the court not

warranted by the proof do not affect the judgment. (*Averill Mach. Co.* v. *Taylor*, 70 Mont. 70, 223 Pac. 918.)

Applying this rule, the judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY, STARK and MATTHEWS concur.