## John W. Hill's Admr. v. Chester Hill.

(Decided March 19, 1926.)

### Appeal from Boone Circuit Court.

1. Trial—Finding of Jury on Equitable Issue of Fact in Equitable Action is Merely Advisory to Chancellor.—On trial of an equitable issue of fact in an equitable action, jury finding is merely advisory to chancellor, and he may either enter judgment in accordance therewith or ignore such finding and enter judgment according to law of case as applied to facts in evidence.

2. Contracts—Evidence Held Not to Show that Contract Between Decedent and Defendant as Purchasers of Land, by which Defendant was Primarily Liable for Deferred Payments and for Cash Payments Made by Decedent for Him, had Been Canceled by Subsequent Oral Agreement.—Evidence held not to show that agreement between decedent and defendant as purchasers of land, pur-

porting to make them joint owners, and making defendant's interest primarily liable for deferred payments and for cash payments made by decedent for him, had been canceled by subsequent oral agreement.

S. W. TOLIN, M. C. SWINFORD and CHESTER M. JEWETT for appellant.

JOHN L. VEST and B. H. RILEY for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER— Reversing.

On the first of March, 1919, E. H. Doyle, conveyed to John W. Hill and Chester Hill, his son, jointly, a tract of about 225 acres of land in Boone county. The consideration was $35,000.00, of which $20,000.00 was paid at the time of the conveyance, and lien notes for the remaining $15,000.00 executed by the vendees.

On the face of the deed the vendees owned each an undivided one-half interest, but on the same day the father and son entered into a separate written contract defining their interests as between themselves, and disclosing the facts with reference to the payments made and those to be made. That paper recites that the total consideration was $35,000.00, of which the $20,000.00 paid was wholly paid by John W. Hill out of his individual funds, and that no part of the same had been paid by Chester Hill; and that in as much as it was the purpose that each of them should own and hold an undivided one-half interest in the land, and in order to establish the rights of each party, it was recited what the consideration was, and that as John W. Hill had already paid $2,500.00 more than his one-half thereof Chester Hill bound himself to repay the same to John W. Hill thereafter together with interest. Chester also agreed and bound himself to pay the two deferred payments of $7,500.00 each, together with interest thereon, and bound himself to save John W. Hill harmless because of his signing the notes for the deferred payments. It was likewise agreed in that writing that in the event of a sale of the farm the proceeds should be so distributed that each of the parties to the contract should receive one-half of the net proceeds thereof; and that if either of the parties should desire to sell his interest in the land he was first to give the other the privilege or opportunity of buying it.

It was further agreed that whenever the land should be sold Chester Hill was to receive no part of the proceeds until the deferred payments with interest had been paid, and in addition the $2,500.00 and interest so paid for him by his father in the cash payment, and both of said sums, or such of them as might be unpaid at the time of the sale should be paid from the proceeds of the one-half undivided interest in the land owned by Chester Hill.

Obviously the outstanding purpose of this agreement was to make, as between the joint owners, the interest of Chester Hill primarily liable for the deferred payments, as well as for that part of the cash payment made by his father for him.

Chester Hill was a married man and he and his family and his father and his family each moved upon the farm and lived upon it and appear to have jointly operated it.

Up to the first of March, 1921, they had reduced the $15,000.00 indebtedness to about $10,000.00, and they then joined in a mortgage to a Boone county bank whereby they borrowed on the farm this $10,000.00 and paid the remainder of the purchase money, but still had the $10,000.00 mortgage.

In November, 1921, John W. Hill died, and in this action by his personal representative to settle his estate, the question having arisen as to the rights of his estate and of Chester Hill in the land, the latter filed his answer asserting the ownership of an undivided one-half interest in the farm, whereupon the administrator relied upon the terms of the written contract between him and his father executed simultaneously with the deed they took from Doyle. Chester Hill in avoidance of the terms of that agreement asserted in his pleadings that the same had been rescinded by agreement between him and his father when they executed the $10,000.00 mortgage, which allegation was put in issue by the plaintiff, and on this issue upon motion of Chester Hill an issue out of chancery was ordered, a trial had and a verdict by the jury to the effect that it had been cancelled, and this appeal is from a judgment, entered after the return of that verdict cancelling the same.

No writing of any character is put in evidence to show a cancellation of this contract, and the defendant relied wholly upon the introduction of oral testimony on that issue.

On the trial of the issue no formal instructions were given by the court, but the jury was only directed to find from the evidence whether the written contract so entered into was thereafter cancelled by another verbal contract entered into between John W. Hill and Chester Hill, and to merely answer in their verdict "yes" or "no."

On the trial of an equitable issue of fact in an equitable action which is submitted to a jury, the finding is merely advisory to the chancellor and does not bind him to enter a judgment in accordance with the finding; he may either enter a judgment in accordance therewith, or he may ignore the finding of the jury and enter a judgment according to the law of the case, as applied to the facts in evidence. Therefore the primary and controlling question here is whether notwithstanding the finding the court should have adjudged upon the evidence heard that there had been no agreement of cancellation.

As stated above no writing of any character was introduced in evidence bearing upon the issue submitted; on the contrary appellee relied upon the oral testimony of four witnesses, three of whom were his sons, and the other a work-hand upon the farm. Their evidence is merely the statement of conversations alleged to have been had by them with John W. Hill the decedent, both before and after the transaction whereby the two Hills borrowed the $10,000.00 from the bank and executed their mortgage.

The contract of March 1st, 1919, between the parties was introduced in evidence, and recites on its face that the same was signed in duplicate, and the other evidence shows that each party had a copy of the same.

The first witness was John T. Hill, the son of appellee, and the grandson of the decedent. He relates two conversations on the subject between him and his grandfather. The first one appears to have occurred before the borrowing of the $10,000.00, and he says that decedent said to him that,

"When the notes come due on the place we are making arrangements to pay the money, we are going to make a mortgage to the bank for it, and the contract between me and Chester is no good and I am going to give it back to him."

He then relates a conversation had subsequent to the mortgage transaction in which he says his grandfather said to him,

"The only thing was said to me was he gave the contract back to my father, that it was no good any more, that he had come up to what they had agreed."

Obviously the first conversation was no evidence of a cancellation; at most it was only an expression of a purpose upon the part of decedent to in the future make some different arrangement whereby he contemplated returning the contract to Chester. And the second conversation is to the effect that he had given the contract back to Chester *because its terms had been complied with by him.* This latter statement attributed to the decedent is wholly at variance with all the record evidence introduced. The whole suit to settle his estate discloses that at the time of the execution of the $10,000.00 mortgage only $5,000.00 of the $15,000.00 lien debt had been paid by Chester or anybody else, and obviously therefore he could not have made the statement that Chester *had complied with his part of the agreement.*

The next witness was Rodney Martin, the work-hand on the farm, who says that after the mortgage had been executed decedent said to him,

"They had paid off $10,000.00 and he gave his son his note. . . . Said it was not no account to him and he gave it to his son."

Clearly this evidence, if accepted at its face value, cannot be said to have had any reference to the contract which it is claimed was rescinded; for it is disclosed in the evidence that there were other transactions between decedent and his son Chester to which it might have had reference. It appears on its face to have been about a note held by the father against the son which he had given up to him, and manifestly can have no bearing upon the issue here involved.

The next witness was Eugene Hill, another son of appellee, who says in substance that he never had any conversation with his grandfather about the cancellation of the contract, but that upon one occasion he had seen among his grandfather's papers one of the original contracts of March 1st, 1919, and that his father's name was attached to it. Manifestly in the light of the fact that

the contract was signed in duplicate and a copy delivered to each, this evidence can have no effect upon the issue involved.

The next witness was Willard Hill, another son of appellee, who testifies in substance that his grandfather told him he had given the old contract back to Chester, and that after they had borrowed the $10,000.00 and paid the lien debt,

"He said he give the contract back to him, that he had a half interest in the place."

And at another place he says that his grandfather said in referring to the $10,000.00 mortgage:

"When that debt is paid half of the farm will be your father's, and I give the contract back to him."

Assuming that Chester had paid the $5,000.00 which had been paid on the original lien debt of $15,000.00, this evidence could only mean that the father said when Chester had complied with the terms of the original contract and paid off that additional $10,000.00 mortgage he would own a half interest in the farm. This was merely a restatement of the general terms of the original contract, and instead of being evidence of its cancellation was unmistakable evidence to the contrary.

This was all the evidence offered in behalf of Chester on the issue of cancellation, and it takes no scrutinizing mind to see not only that it is hopelessly contradictory in itself, but that it is of that flimsy and uncertain character which will not justify a chancellor in setting aside a solemn written contract entered into between two parties, one of whom is dead and against whose estate the cancellation is made.

Without further discussion we are of opinion that the chancellor should have ignored the finding of the jury, and entered a judgment upholding the contract of March 1st, 1919, and to the effect that the same had not been cancelled by agreement.

The judgment is reversed, with directions to enter a judgment as herein indicated.