Submitted on briefs April 28, reversed September 14, 1927, argued on rehearing February 14, original opinion adhered to April 24, petition for further consideration denied June 5, 1928.

## MERCEDES E. WADSWORTH *v.* ALETTA BRIGHAM ET AL.

(259 Pac. 299; 266 Pac. 875.)

Marriage—To Constitute "Common-law Marriage" Parties must Agree to Become Man and Wife, must Hold Themselves Out as Such, and must have Cohabited Subsequent to Agreement.

1. To constitute a common-law marriage there must be an agreement between the parties that they become man and wife, and they must hold themselves out to the world as such, and there must be cohabitation subsequent to the agreement.

Marriage — Birth of Issue is not Required to Constitute Common-law Marriage.

2. To constitute a common-law marriage it is not necessary that there be birth of issue.

Bastards — Marriage—Act Legitimatizing Marriages of Persons Who have "Cohabited as Husband and Wife" for Over Year and Children, the Issue Thereof, Held not to be Mere Restoration of Common-law Marriage (Laws 1925, p. 484).

3. Laws of 1925, page 484, which legitimatizes marriages where the parties have "cohabited as husband and wife" for over one year

---

1. Necessity of cohabitation for common-law marriage, see notes in Ann. Cas. 1915C, 1018; 33 L. R. A. 27. See, also, 18 R. C. L. 395. Common-law marriages, see note in 124 Am. St. Rep. 105. See, also, 18 R. C. L. 389 et seq. General characteristics and validity of common-law marriages, see note in L. R. A. 1915E, 8. See, also, 18 R. C. L. 389 et seq. Children, when deemed intentionally omitted from will. See note in 39 Am. Dec. 740.

and children, the issue thereof, *held* not to be a mere restoration of the practice of common-law marriage, so that the rules of law under the statute and the common-law marriage rules are not the same.

**Marriage — Common-law Marriage cannot Exist in Oregon.**

4. There is no common-law marriage in Oregon.

**Bastards—Daughter not Mentioned in Father's Will and Legitimatized by Statute Held to have Claim on His Estate (Laws 1925, p. 484; Or. L., § 10101).**

5. Daughter not "named or provided for" in father's will under Section 10101, Or. L., and legitimatized by Laws of 1925, page 484, providing that where persons have cohabited as husband and wife for over one year such cohabitation shall constitute valid marriage and children, the issue thereof, shall be legitimate, *held* to have claim on father's estate.

**Wills— Intention to Disinherit Child must be Clearly Shown by Words Naming or Providing for the Child in the Will Itself and not from Extrinsic Evidence.**

6. An intent to disinherit a child of the testator must be clearly shown by the words of the will naming or providing for the child and may not be deduced from extrinsic evidence.

**Bastards — Will Provision That to "Any Person Claiming to be Heir" and Establishing Claim "I give" $5 Held not to "Name or Provide for" Child Legitimatized by Statute and not Specifically Mentioned (Laws 1925, p. 484; Or. L., § 10101).**

7. Will provision that, "In the event any person claiming to be a legal heir" shall establish such claim "I give unto her $5," *held* not to "name or provide for" under Section 10101, Or. L., a child legitimatized by Laws of 1925, page 484, who is not specifically mentioned in the will.

**Bastards — Will Provision That to "Any Person" Contesting Will "I Give" $5 Held not to "Name or Provide for" Natural Child not Specifically Mentioned Who Contests Will (Laws 1925, p. 484; Or. L., § 10101).**

8. Provision in will that, "In the event any person shall contest this will I give unto him $5" *held* not to "name or provide for," within meaning of Section 10101, Or. L., a child legitimatized under Laws of 1925, page 484, and not specifically mentioned, who contests will.

---

4. Validity of common-law marriages in American jurisprudence, see notes in Ann. Cas. 1912D, 598; Ann. Cas. 1917E, 252; 39 A. L. R. 538. Pretermitted heirs, see note in 115 Am. St. Rep. 580. See, also, 38 R. C. L. 82. Admissibility of parol evidence to show whether omission of child from will was intentional, see notes in 8 Ann. Cas. 637; Ann. Cas. 1916A, 718. See, also, 28 R. C. L. 82. Admissibility of extrinsic evidence as to whether omission of child from will was intentional, see note in 51 L. R. A. (N. S.) 646.

6. When children entitled to inherit notwithstanding will, see note in 12 Am. St. Rep. 97. See, also, 9 R. C. L. 41.

Wills—Will must be Read as a Whole.

9. In construing will the whole will must be considered together.

Bastards — Will Held not to Show Intention to "Provide for" Testator's Child Legitimatized by Statute (Laws 1925, p. 484; Or. L., § 10101).

10. Will *held* not to show intention to "provide for" under Section 10101, Or. L., a child legitimatized by Laws of 1925, page 484, who was not specifically mentioned in the will; especially where the testator recited that he was an unmarried man.

Bastards — Where Testator Does not Expressly Disinherit Children or Give Them Nominal Sum They must be Actually and Substantially "Provided for" to Prevent Them from Inheriting Under Statute (Or. L., § 10101).

11. While testator has a right to disinherit his children or expressly give them a nominal sum, when he fails to do that, in order to exclude the children from inheriting under Section 10101, Or. L., they must be actually and substantially "provided for."

Wills — As to Party Contesting Will in Good Faith, Provision in Will That Any Contestant Should Receive $5 Only Held Void as Against Public Policy.

12. As to a party contesting a will in good faith, provision in the will that if any person should contest will the testator gave them $5 and revoked any other devise or bequest made to such contestant *held* void as against public policy.

Bastards — Setting Aside Jury's Findings, in Will Contest, of Circumstances Which Legitimatized Child Under Statute Held Error, Where Findings were Supported by Evidence (Laws 1925, p. 484; Or. L., § 10101).

13. Setting aside jury's findings, in will contest, that contestant, not mentioned in the will, was the daughter of testator and that testator and contestant's mother cohabited as husband and wife for over one year, which circumstances would legitimatize the contestant under Laws of 1925, page 484, was error, where findings were supported by preponderance of evidence and hence the child was *held* entitled to estate under Section 10101, Or. L.

## ON REHEARING.

Bastards — Statutes Legitimating Issue of Void Marriages may be Given Retrospective Operation to Carry Out Legislative Intent.

14. Remedial statutes legitimating issue of void marriages may be applied retrospectively, where legislative intent to give statute retrospective operation is apparent.

---

9. See 28 R. C. L. 207.

12. Conditions in wills preventing contests on penalty of a forfeiture. See note in 60 Am. Dec. 113. See, also, 28 R. C. L. 315.

**Bastards — Statute Making Cohabitation as Husband and Wife for One Year Valid Marriage for Purpose of Legitimating Offspring Held Retrospective in Operation (Laws 1925, p. 484).**

15.  Laws of 1925, page 484, making cohabitation as husband and wife for one-year period valid marriage for purpose of legitimating offspring of such cohabitation, *held* to have retrospective effect to legitimate children born prior to enactment of statute.

**Statutes—Statute must be Construed With View to Evil Sought to be Corrected.**

16.  In construing statute, court must look to evil which the legislature sought to correct and must follow law as legislature declares it.

**Constitutional Law — Statute will not be Held Void Unless Clearly in Conflict With Constitution.**

17.  Unless conflict between Constitution and statute is clear, court will not declare the statute void.

**Constitutional Law — Police Power Covering Laws Relating to Public Health, Morals and Welfare is Exclusively Vested in Legislature, and is not Disturbed by Court Unless Fundamental Rights are Interfered With.**

18.  Police power is vested exclusively in the legislature and covers all laws relating to public health, morals and welfare, and is interfered with by courts only when fundamental rights beyond the scope of the police power are disturbed.

**Constitutional Law — Validity of Statute Capable of Two Meanings Should be Upheld, and Statutes Should be so Construed as to Avoid Doubts as to Constitutionality.**

19.  If the statute is capable of two meanings, one of which would uphold it and the other invalidate it, court will uphold statute's validity, and statute must be construed if possible so as to avoid not only conclusion of unconstitutionality, but also grave doubts on that score.

**Constitutional Law—Court cannot Usurp Power of Legislation.**

20.  Function of courts is to construe the laws, and the courts cannot usurp power of legislation.

**Statutes—Valid Part of Statute may Stand Where Parts Thereof are Separable.**

21.  When different parts of a statute are separable, one part may stand though other part is unconstitutional.

---

16.  See 25 R. C. L. 1015.

17.  See 25 R. C. L. 1000.

18.  Police power defined, see note in 53 Am St. Rep. 572.

19.  See 6 R. C. L. 79; 25 R. C. L. 99.

20.  See 25 R. C. L. 963.

21.  Effect of partial invalidity of statute, see notes in Ann. Cas. 1916D, 9, 104, 127, 136, 139, 158, 171; Ann. Cas. 1918D, 1123. See, also, 6 R. C. L. 121.

**Bastards — Legislature can Declare Children of Illicit Relations Legitimate Without Marriage of Parents.**

22.  · Legislature can declare the children of illicit relations legitimate without marriage of parents as condition precedent to legitimation.

**Bastards — Statute Making Cohabitation as Husband and Wife for Over One Year Marriage for Purpose of Legitimatizing Offspring Held Within State's Police Power (Laws 1925, p. 484).**

23.  Laws of 1925, page 484, providing that in case of cohabitation of parties as husband and wife for over one year such cohabitation, if children are living, constitutes valid marriage, and children born after beginning thereof are legitimate offspring. *held* valid as within scope of state's police power.

**Equity — Jury's Verdict in Equity Case Should not be Set Aside Unless Against Evidence.**

24.  While verdict of jury in an equity case is not conclusive upon the courts, it should not be set aside or disregarded unless clearly against weight of evidence.

**Bastards—Evidence Held to Sustain Jury's Finding of Cohabitation of Plaintiff's Father and Mother as Husband and Wife Establishing Plaintiff's Legitimacy (Laws 1925, p. 484).**

25.  In suit by one claiming as sole heir of deceased for purpose of setting aside certain provisions of deceased's will, evidence *held* to sustain finding that plaintiff's father and mother cohabited as husband and wife for over one year and that plaintiff was offspring of such cohabitation and therefore entitled to inherit as a legitimate child under Laws of 1925, page 484.

**Bastards—Offspring is Legitimate if Parties Live Together as Husband and Wife for Over One Year Though They Do not Agree to be or Hold Themselves Out as Married (Laws 1925, p. 484).**

26.  Under Laws of 1925, page 484, providing that cohabitation as husband and wife for over one year constitutes valid marriage for purpose of making offspring legitimate, does not require an actual agreement between the parties that they are living together in the relation of husband and wife or that they must believe and hold themselves out to the world as being married, but requirements of statute are satisfied regardless of formal intent.

**Constitutional Law—Acts Passed by Legislature cannot be Changed by Judiciary.**

27.  It is exclusive function of the legislature to make law, and acts passed by the legislature cannot be enlarged in scope, added to, abridged, amended or otherwise changed by the judiciary.

**Bastards—Fact That Plaintiff's Father had Rooms Elsewhere During Period of Alleged Cohabitation With Plaintiff's Mother as Husband and Wife Held not to Prevent Plaintiff's Legitimation (Laws 1925, p. 484).**

28.  Fact that during period of cohabitation between plaintiff's father and mother father had rooms elsewhere did not prevent

plaintiff's legitimation under Laws of 1925, page 484, which constitutes cohabitation between persons cohabiting as husband and wife for over one year valid marriage and legitimates offspring.

**Bastards—Jury's Verdict on Question of Legitimacy, Though Only Advisory, Should not be Disregarded Unless Clearly Against Evidence.**

29. Right to jury trial on question of legitimation is discretionary, and its verdict, though only advisory, should not be disregarded except when clearly against weight of the evidence.

---

Appeal and Error, 4 **C. J.**, p. 850, n. 51, p. 875, n. 69, p. 876, n. 71.

Bastards, 7 **C. J.**, p. 945, n. 79, p. 947, n. 99, p. 948, n. 2, 6, 7, p. 959, n. 51.

Cohabit, 11 **C. J.**, p. 949, n. 68, p. 951, n. 89.

Cohabitation, 11 **C. J.**, p. 953, n. 21.

Constitutional Law, 12 **C. J.**, p. 788, n. 97, 1, p. 795, n. 33, p. 883, n. 98, p. 885, n. 9, 10, p. 933, n. 39, 42.

Contracts, 13 **C. J.**, p. 263, n. 78.

Equity, 21 **C. J.**, p. 594, n. 85.

Evidence, 23 **C. J.**, p. 41, n. 73, p. 42, n. 77.

Marriage, 38 **C. J.**, p. 1316, n. 3, p. 1324, n. 66, p. 1325, n. 67, p. 1339, n. 61.

Provide, 32 **Cyc.**, p. 740, n. 26.

Provided, 32 **Cyc.**, p. 740, n. 34.

Statutes, 36 **Cyc.**, p. 976, n. 27, p. 1110, n. 56, p. 1115, n. 99, p. 1173, n. 52, p. 1209, n. 37, 41.

Wills, 40 **Cyc.**, p. 1358, n. 75, p. 1414, n. 26, p. 1437, n. 48, p. 1713, n. 54.

From Multnomah: GEORGE TAZWELL, Judge.

In Banc.

This is a suit brought by Mercedes E. Wadsworth, claiming to be the sole heir of John H. Brigham, deceased, for the purpose of setting aside the provisions of a certain will made by the deceased whereby all the defendants except the Security Savings & Trust Company are named as beneficiaries. The Security Savings & Trust Company is named as trustee to carry out the provisions of said will, the plaintiff not being in any way named therein.

The plaintiff alleges that she is the daughter and sole heir of John R. Brigham, and, not being mentioned in the will, that she is entitled to inherit as against all the beneficiaries in the will, some of whom are nephews and nieces and others of no relation whatever.

The case was tried before Honorable GEORGE TAZWELL, Judge of the Circuit Court of Multnomah County, but upon request of plaintiff he called an advisory jury and submitted to them the following questions:

Question 1: Is the plaintiff the daughter of John R. Brigham, deceased, who is mentioned in the pleadings in the above-entitled proceeding, and did the said John R. Brigham and the mother of plaintiff cohabit in the State of Oregon as husband and wife for over one year, the plaintiff being born as result of said relation? Answer: Yes.

Question 2: Were the parents of the above-named plaintiff ever formally married by means of a marriage ceremony either before or after the birth of plaintiff and while the said parents and each of them was single and capable of entering into a marriage contract? Answer: No.

The court set aside these findings as not supported by the evidence, and entered findings to the effect, first, that John R. Brigham at the time of his death, and always, had been unmarried and that he and Emily E. Liddy, mother of plaintiff herein, did not cohabit for one year or over and that plaintiff is not the issue of any such relation. Second, that the great weight of evidence is contrary to the verdict of the jury to the effect that John R. Brigham and Emily E. Liddy lived together as husband and wife in the State

of Oregon for one year and that plaintiff is the result of such cohabitation, and that such verdict should be disregarded, set aside and held for naught. Third, that John R. Brigham and Emily E. Liddy, mother of Mercedes E. Wadsworth, plaintiff, were never formally married by means of a marriage ceremony either before or after the birth of plaintiff, and that plaintiff is not the issue of any marriage relation existing between John R. Brigham and Emily E. Liddy. Thereafter, the court made the following conclusions of law:

First: That the plaintiff is not an heir at law of John R. Brigham, deceased, and is not entitled to any relief whatsoever in this proceeding, and that the petition heretofore filed by her should be dismissed with prejudice.

Second: That the defendants are entitled to their costs and disbursements in this proceeding.

Thereafter a decree was entered conforming to these conclusions of law, from which decree the plaintiff appeals to this court. REVERSED.

For appellant there was a brief over the names of *Messrs. Hoy & Childers, Mr. Thomas Mannix* and *Mr. Dan E. Powers.*

For respondents there was a brief over the names of *Mr. V. V. Pendergrass* and *Mr. Charles Spackman, Jr.*

McBRIDE, J.—The first proposition that confronts us here is the question as to whether the plaintiff is the daughter of John R. Brigham. As to this, we think the testimony very largely preponderates in her

favor. Plaintiff testified that she was born October 13, 1879, in Portland, and that from her earliest recollection she lived with her father, the decedent, and mother until 1883 or 1884, when he eloped with another woman; that she was always told by both that they were married in California a year prior to her birth; that later, being informed that Brigham had denied that she was his daughter, she attempted to obtain proof of the marriage, but owing to the marriage records of San Francisco having been destroyed by the great fire and earthquake of 1906, such proof was not obtainable; and that she was named and always called Mercedes Brigham and attended school under that name and never went by any other name until her marriage. There was a slight attempt to impeach her veracity, but the impeachment was confined to the statement of a single witness and he, although a gentleman of high character, seemed to base his testimony upon the result of a personal estimate from some business transaction with the deceased rather than upon a general reputation existing in the community.

The plaintiff had lived in and about The Dalles for several years, and, certainly, long enough for her general reputation for truth to have become well known in the community; and the fact that no other witness was called on this branch of the case by the defendants is significant.

We are disposed to accept her statement as those of any other unimpeached though vitally interested witness who testified to occurrences many of which took place more than forty years before this trial, and, while in view of the interest she has in this proceeding and the time that has elapsed, her statements

may have been unconsciously colored, we do not feel
at liberty to reject them entirely.

Her testimony, as to the general conduct of the de-
ceased toward her, indicates all the usual affection of
a father for his daughter.   He called himself "papa,"
made her presents and conducted himself during her
tender years as a father would toward a beloved child.
One incident that strongly corroborates her statement
in this regard, and which cannot be disputed, is a
present of a childish series of leaflets embodying pic-
tures and verses of a "Mother Goose" character upon
which is written in his undisputed and undisputable
handwriting, "To Sadie Brigham from Papa," the
words "to" and "from" being printed and the other
words being in Brigham's handwriting.   In corrobo-
ration of her claim, Mrs. Mary K. Britten of The
Dalles testified as follows:

"Q. Where do you reside, Mrs. Britten?   Where
do you live?   A. Your Honor, I am hard of hearing,
I wish counsel would come forward.

"Q. I'll speak a little louder; I think that she can
hear me.   Where do you live, Mrs. Britten?   A. In
The Dalles, Oregon.

"Q. How long have you lived in the state of Ore-
gon, approximately?   A. It will be forty-six years
November 4th.

"Q. Were you acquainted with John R. Brigham
during his lifetime?   A. I was.

"Q. Did you know, or were you acquainted with the
plaintiff here, Mrs. Wadsworth?   A. I am.

"Q. How long have you known Mrs. Wadsworth,
or how large was she when you first saw her?
A. Well, she was a very little girl; possibly a year
old or more.

"Q. When and where did you first see John R.
Brigham?   A. In The Dalles, Oregon.

"Q. At what place in The Dalles did you see him? A. The Umatilla House.

"Q. Who was with him when you saw him at the Umatilla House? A. Sadie, or Mrs. Wadsworth, and her mother and Mr. Brigham.

"Q. And how large was Sadie at that time, did you say? About how old would you think she was? A. Oh, I should think about a year or more old; she was just beginning to walk.

"Q. Did you meet John R. Brigham formally at that time? Were you introduced to him? A. I was.

"Q. Now, just tell the jury, Mrs. Britten, what took place at that time, at that meeting? How you met him, and what happened? Who was there, and all about it? A. Well, I just came from the boat, from New York state, and we stopped at the Umatilla House, and my sister was with me, and we went in and sat down. They were expecting the news about Garfield's election, and we all went in there and sat down, and we happened to sit in a seat next to Mrs. Wadsworth's mother, and my sister introduced me to Mrs. Liddy; and she says her name was Liddy at one time, but she said, 'Excuse me,' she said, 'It is Mrs. Brigham.'

"Q. Was John R. Brigham there at that time? A. He was sitting next to her.

"Q. What did he say or do, if anything? A. And my sister asked him, 'Are you married?' and he said, 'we are,' and she said, when my sister introduced me, she said, 'If you please I am not Mrs. Liddy; I am Mrs. Brigham; this is my husband'; and we asked him if he was married, and he said, 'We are'; and he picked up the little girl and held her up, and he said, 'Look at our marriage certificate.'"

This witness further testified that upon two subsequent occasions she visited the Brighams in Portland, once at their home in the Reed Block and once at the St. Charles Hotel, and found there Sadie, this plaintiff, and her mother and Mr. Brigham. She

seemed to be a disinterested witness and her testimony is entitled to great weight. The witness further testified, in substance, that she visited Brigham in company with plaintiff a few days before his death. That he evinced a desire to see plaintiff, who was waiting outside, and that when plaintiff, at the call of the witness, entered the room he, Brigham, greeted her affectionately; that they embraced each other with tears and conversed but out of the hearing of witness who withdrew to another part of the room.

Mr. Comini of The Dalles testified that he saw Mr. Brigham in regard to a tombstone for plaintiff's mother and when he left Brigham told him to give his best regards to his daughter, meaning plaintiff.

Thomas A. Doud, a witness for plaintiff, testified that he formerly resided in Binghampton, New York, where Mr. Brigham was born and where his folks lived; and that he came to Portland in 1882 and soon became acquainted with Mr. Brigham, an acquaintance, which seems to have been fairly intimate. Among other matters, he testified as follows:

"Q. Please tell the jury what you said and what he said: A. Well, he made the statement to me one day in the hotel—I can't give the date,—it was in the fall. I come back from the east on the 19th of November, and it was after that, in the fall of 1924; we had a conversation there in regard to some checks that he said had been cashed by the First National Bank, that he never had drawn; and I asked him who he supposed would do anything of that kind, and if he thought they were forged, and he said he was sure they was, from the fact that he hadn't wrote these checks. I asked him what he was going to do, and he didn't say what he intended to do, but he said that he had got to make some disposition of his property, and I asked him what he intended to do, to make a will or let it go that way or not, and he said he was going to

make a will, and I asked him who, in this country, that he had, and he said some nieces and brothers, and also a daughter in The Dalles, Oregon.

"Q. And did he say anything about leaving any money to the daughter? A. He did.

"Q. What did he say about that? A. He said he wanted to leave her somthing, and he was going to make arrangements under the will to leave her something.

"Q. What, if anything, did he say about his wife? A. Well, I asked him where the folks was; that is the way he come to tell me about the girl being in The Dalles, he said her mother was dead, and that the girl was living in The Dalles.

"Q. That the girl was what? A. Living in The Dalles.

"Q. Was that all he said? Well I couldn't state; there was other conversation about his property down in Tillamook and about some property here in Portland. He said he had some ranches.

"Q. What was your business in Portland, Mr. Doud? A. At the present time?

"Q. Yes. A. I am in the mining business; I am a mining engineer, and I make my home here in the winter sometimes.

"Q. What did you do when you first came out here? A. The first thing I done in Portland was to build some houses here,—contractor and builder.

"Q. You have lived in Portland all of these years? A. I have known Portland since May, 1882."

Mr. S. K. Watson testified, among other matters, that in 1923 he was in The Dalles and that plaintiff, who was conducting a fruit farm near that place, asked him to take a box of apples to her father, referring to Mr. Brigham, and told him where to find him; that he took the fruit to Mr. Brigham and continued his testimony as follows:

"And he said 'Sit down,' and I sat down and had quite a long talk with him. Of course, he was an old

man, and he asked me a good many questions: How long I had been in the country, where I was from, and my business, and wanted to know if I hadn't heard of him, and had quite a long conversation with him; and I delivered the fruit, and he commented on Mrs. Wadsworth, his daughter, sending him fruit at different times, and spoke about his little girl, and spoke about her mother; and went ahead and asked me all about the place up there, and how she was getting along; and I told him that she was out there working and had been working, and I thought was going to make a go of the place, and he said he hoped so. He said it would be a good home for her, and went ahead and told me that he had advanced the mother money, or taken care of a mortgage on that property at The Dalles, so that Mrs. Wadsworth's mother, and he says 'My Daughter' would have a home, and he said, 'It is a nice place up there,' or words to that effect. I don't just remember whether it was a mortgage, or whether it was the initial money that bought this property, but it was money he had advanced to Mrs. Wadsworth's mother; and we talked along awhile, and he wanted to know if I made many trips up to The Dalles, and I said, 'I have to go through The Dalles quite frequently in going to Eastern Oregon,' and he said, 'Sometime when you are going up, I would be pleased to ride up with you and have a talk with you.' I said, 'All right'; and there was a time come along that I called him up to go and told him I would be over in the hotel later in the evening, and I thought I would drive over that afternoon to The Dalles. He said, 'I'll have my grip packed and ready.' I was representing the Oregon Livestock Association, and Mr. Ruby is president, and I had been associated with them for some time, and there was a change come there in the office some way or another, so I didn't go, and I called him up in the evening and told him I wasn't going. He said, 'All right, sometime again, let me know, and I'll go up to see my daughter.' That was about the sum and substance of my conversation with Mr. Brigham.

"Q. Did he, by his conversation, indicate any feeling or regard for the daughter, or for the mother? A. Oh, yes; when he said that he advanced the money to procure the place there, or take care of the loan on the place, it was for the purpose so that Mrs. Wadsworth's mother and her would have a home."

While there is evidence mostly by relatives of declarations on the part of Brigham that Mrs. Wadsworth was not his daughter, we think the evidence largely preponderates in favor of plaintiff on this branch of the case, and we are prepared to find and do find that she is the daughter of John R. Brigham and Mrs. Emily Liddy-Brigham as she sometimes called herself. But the fact that she was Brigham's daughter, and the fact that she was his daughter by reason of intercourse with Emily E. Liddy, does not establish plaintiff's right to inherit in this case. Her right, if she has any, depends upon the construction of Chapter 269, Laws of 1925, which chapter, including the title, is as follows:

"An Act to legitimatize certain marriages and children the issue thereof.

"Be it Enacted by the People of the State of Oregon:

"Section 1. In case a man and a woman, not otherwise married heretofore, shall have cohabited in the state of Oregon as husband and wife, for over one year, and children shall be living as a result of said relation, said cohabitation, if children are living, is hereby declared to constitute a valid marriage and the children born after the beginning of said cohabitation are hereby declared to be the legitimate offspring of said marriage."

1-4. The whole case hinges upon the construction of this chapter. It has been treated to some extent by counsel for the respondents as simply re-enacting the doctrine of common-law marriage, but it differs from

it in many particulars. To constitute a common-law marriage there must be, first, an agreement between the parties that they become man and wife and that they hold themselves out to the world as such, and second, there must be cohabitation subsequent to the agreement: *Huard* v. *McTeigh*, 113 Or. 279 (232 Pac. 658, 39 A. L. R. 528), and cases therein cited. The statute of 1925 requires all this, as will be seen, and something more. In a common-law marriage the birth of issue is not required; while in the act of 1925, *supra*, the birth of issue and its living existence at the death of the supposed parent must concur before there can be any inheritance, and the parties must have cohabited together as man and wife for at least a year previous to the birth of such issue. So, the statute cannot be said to be a mere restoration of the practice of common-law marriage which had reference to the status of the parties to the supposed contract rather than to its result upon the issue; while, on the contrary, the statute under consideration seems to make the effect of the supposed relation between the parties to look rather to the welfare of the children born of such relation than to the interest of the contracting parties. This statute is a radical departure from the common-law idea, as a child born out of wedlock was regarded with a cruelty which would not be a credit to modern jurisprudence. Such a child was designated as *nullius filius* or nobody's child; was incapable of inheritance, and the sins of the parents, instead of being visited upon them, were visited upon the unfortunate issue of their breach of the ordinary covenants of marriage. We take it that this statute was enacted chiefly for the protection of such unfortunate children from the consequences of the sins of their parents rather than for the protection of the

parents themselves from the consequences of their own misdoings. It has been well settled in this state in the case of *Huard* v. *McTeigh, supra,* that common-law marriages cannot exist in this state and we take it that it was not the intent of this statute to restore common-law marriage to the condition of legitimacy, but rather to protect the issue of irregular and illegitimate cohabitation from the consequences which would otherwise accompany it. The requirement that the parties should have lived together and cohabited as man and wife has no real significance as affecting the legitimacy of their relation. In fact, the old indictments for lewd cohabitation usually charged that the parties, not being married to each other, openly and notoriously cohabited together as man and wife, which simply signifies that they lived in each other's company not casually or infrequently, but commonly and frequently as man and wife and had sexual relations together; and this, we think, is shown by the testimony in this case.

We dismiss from consideration the theory of the plaintiff that there was a ceremonial marriage in California. It is altogether possible and indeed very probable that to excuse their apparent relations to their child, they may have told her that they had been married in California, which their subsequent conduct indicates was strongly the reverse. We are unable to accept that theory and the jury clearly and plainly rejected it. The testimony heretofore quoted, as well as other testimony in the case, we think, preponderates in favor of the theory that they were living together by agreement as husband and wife and this continued until the decedent, who appears to have been rather loose in his sexual relations, became enamored of another woman and left plaintiff and

eloped with his second sweetheart, which conduct she requited by inflicting upon him a severe thrashing upon his return to Portland. The fact that succeeding this episode plaintiff's mother brought an action for seduction against Brigham can have no legal effect upon plaintiff's status in this proceeding. Finding herself deserted, it was natural for her to seek the assistance of an attorney who would probably advise her that common-law marriages did not exist at that time and that her relations with Brigham were in the eyes of the law not only illegal but perhaps criminal, and that her only hope for obtaining redress lay in an action for seduction. In fact, until the passing of the statute of 1925, *supra*, there was no redress for mother or child. Under these circumstances she married another man, and considering the fact, that Brigham later and in a repentant mood was willing to dole out a little money now and then to assist her and her child, furnished to her an ample reason for not wishing to attempt to compel him to do more, and to be willing to maintain silence as to her past relations with him. The mother of plaintiff died without hope for that redress which this statute has given the child.

The evidence indicates that something over a year prior to the birth of plaintiff Mrs. Liddy's husband died and that thereafter she entered into sexual relations with the deceased; that she either rented from him or he provided a house which was used by her as an assignation house and frequented by him; that she returned to him of nights, slept with him, bringing him the wages from the house over which she presided, and that the house was conducted in pursuance of a common purpose by both of them. Outside of this, there is not a syllable of testimony of her having

had illicit relations with any other person than the deceased, and, while she was engaged in an immoral business, she was at least physically true to her relations to him until he became enamored of another woman. How much influence he may have exerted toward leading her to take up the immoral business and by which he at least to some extent profited does not appear, but that she was a widow and presumably not in a condition to enter into such business without assistance seems very probable.

A point is raised and very ably argued by counsel for respondents as to whether, conceding for the purposes of argument that plaintiff has proven herself the legitimatized child of decedent by virtue of the act of 1925, *supra,* she does not fall within the terms of the following clause of the will:

"In the event that any person shall contest this will, or in the event that any person claiming to be a legal heir of mine shall legally establish such claim, I give and bequeath unto him or her the sum of $5.00 in cash, and. revoke any other devise or bequest heretofore made to him or her, in the event any such has been made."

5. It is argued that under this clause the plaintiff in any event has been "otherwise provided for" within the meaning of the act of Section 10101, Or. L. We are of the opinion that as applied to this case or as to any case where the prosecution of the suit is in good faith, such a provision is void as against public policy. If, as we here hold, the plaintiff has a legitimate claim to the whole or any part of the estate of decedent, it would seem a mockery to say that in case she should establish such claim she should be cut off with what amounts to a mere nominal sum, and that after spending perhaps hundreds of dollars to estab-

lish the fact that she is the legitimate daughter of
decedent, she must be content with the unsubstantial
sum of $5. This question has been thoroughly con-
sidered in *Roots* v. *Knox*, 107 Or. 96 (212 Pac. 469,
213 Pac. 1013), in a carefully written opinion by Mr.
Justice BROWN, in which it is held, among other
matters, that the intention of the testator to omit a
child from the benefit of its inheritance must be de-
termined from the will itself. This branch of the
subject will be considered at length, but here atten-
tion is called to his quotation from *Boman* v. *Boman*,
49 Fed. 329, as follows:

"The fact that the children are not named or al-
luded to in such a manner as to *affirmatively* show
that they were in the testator's mind will furnish
conclusive evidence that they were forgotten." Cit-
ing *Wetherall* v. *Harris*, 51 Mo. 68; *Gerrish* v. *Gerrish*,
8 Or. 351 (34 Am. Rep. 585).

6. The opinion of Mr. Justice BROWN goes thor-
oughly into the subject and is conclusive as to the
point that the intent to disinherit a child of the tes-
tator must be deduced from the will itself and not
from extrinsic evidence.

From the same case Mr. Justice BROWN quotes as
follows:

"The terms of the will, in order to show the intent
of a testator to remember his children, or to make pro-
vision for them, should, under the statute, be clear,
specific, definite and certain. The presumptions of
the law are all in favor of the children. These pre-
sumptions, in order to disinherit them, or to cut them
off with a shilling or other nominal sum, can only be
overcome by the use of words plainly indicating that
the testator had his children in mind at the time he
made his will. This must appear, either by express

mention, or by necessary implication from the face of the will itself.''

The words of the will must show that the testator named or ''provided for'' the children and must be certain. It is not a matter of guesswork or presumption.

In *Thomas* v. *Black,* 113 Mo. 66, 69 (20 S. W. 657), the court said:

''It must appear on the face of the will that the testator remembered them, and, where they are neither expressly named nor alluded to as to show affirmatively that they were in the testator's mind, such presumption becomes conclusive.''

In *McCoy* v. *Bradbury,* 290 Mo. 650, 659 (235 S. W. 1047, 1050), the court in speaking of a statute containing the identical words of the Oregon statute, namely, the words, ''provided for,'' said:

''A gift by implication will not be inferred from mere silence, or from extrinsic facts; it must be founded on expressions in the will itself. A testamentary intention not found in the will cannot be incorporated therein by extrinsic evidence and an implication then based on that.''

And again, in *Pounds* v. *Dale,* 48 Mo. 270, the court said:

''In considering the will under consideration, the only question to be considered is whether there is anything in the will that rebuts the presumption that Mrs. Pound was forgotten, which presumption arises from the fact that she was not named or 'provided for' in the will.''

In *Roots* v. *Knox,* 107 Or. 96 (212 Pac. 469, 213 Pac. 1013), it is stated at page 105, that the Washington statute is identical with the Oregon statute. In the case of *Bower* v. *Bower,* 5 Wash. 225 (31 Pac. 598),

the will provided that all of the property of the testator was devised "to his wife and her heirs forever." It was claimed that the mention of heirs "provided for" the children, but the Supreme Court of Washington held otherwise. The language of the court, which has been approved in the foregoing opinion of Mr. Justice BROWN, is as follows:

"The positive provisions of our statutes are that the children must be named or 'provided for' in the will. What is meant by the term, 'provided for' as so used? In our opinion it refers to some beneficial legal provision, and we are unable to agree with the contention of the respondent that such children can be said to have been 'provided for' by an absolute devise to another, even although the testator thought that the interest of the children would better be subserved by such devise than by one directly to them. The words 'provided for' as used in said section must be held to have a more definite meaning than that contended for by respondent, and we think that no will can be sustained upon the ground that provision has been made for the children, when the only attempt to provide for them has been by an absolute devise to a person other than said children. In the case at bar, then, the children are neither named nor provided for in the will, and under the express terms of our statute we think it must be held ineffectual as to them."

*In re Barker's Estate,* 5 Wash. 390 (31 Pac. 976), in considering the same statute, the same result was arrived at. The will in that case provided that the testator gave all her property "to her well beloved husband, to the exclusion of everyone else who may or might be entitled to the same, and to him and his heirs and assigns forever." It was claimed in this case that the expression "to the exclusion of everyone else who may or might be entitled to the same"

named the children and excluded them. The Supreme Court of Washington, following *Bower* v. *Bower, supra,* refused to follow this line of reasoning, and said:

"There must be some substantial provision for the children of which they can legally avail themselves, or else there must be an actual naming of such children in the will, or the same will be ineffectual as against such children."

In *Purdy* v. *Davis,* 13 Wash. 164 (42 Pac. 520), where the doctrines of *Bower* v. *Bower* and *In re Barker's Estate, supra,* were followed, the children were expressly named and "provided for" by way of a contingency, or a contingent remainder, but the Supreme Court held that that was not sufficient. The words of the will are as follows:

"Gift to Percival A. Purdy, and 'if the said Percival A. Purdy (appellant) should marry again after my demise all my property, both real and personal is to belong to any one of my children that may be born to me before my demise.' "

At the time of the execution of this will a child was ten days old and thereafter the testatrix died.

The Supreme Court of Washington, regarding this contingent provision for the children, quoting with approval from the case of *In re Barker's Estate, supra,* said:

"Under our statute there must be some substantial provision for the children of which they can legally avail themselves or else there must be an actual naming of such children in the will or the same will be ineffectual as against such children."

The clause of the Brigham will, which it is claimed names the children, reads as follows:

"In the event that any person shall contest this will, or in the event that any person claiming to be a legal heir of mine shall legally establish such claim, I give and bequeath unto him or her the sum of five dollars in cash, and revoke any other devise or bequest heretofore made to him or her, in the event any such has been made."

7. It is to be noted that the plaintiff is not named in this paragraph. She is not included in the word "heirs." See *Neal* v. *Davis,* 53 Or. 423, 430 (90 Pac. 69, 101 Pac. 212), where it was expressly held that the word "heirs" did not name or "provide for" the children involved in that case. The Supreme Court of Oregon said:

"The term 'heirs at law,' however, in its general definition includes many others (besides children). It is not limited to children. It may be used, and is often used, in cases where there are no children. It includes parents, brothers, sisters, etc. Who can tell by reading this will what particular heirs were in the mind of the testator at the time he signed the will? Does it clearly appear that it was his intention to provide for the children? Is it manifest upon the face of the will that his children were not overlooked or forgotten? Certainly not. The test there used may be employed in this case, and the same answer must necessarily be returned to the inquiry."

8–11. It follows that the word "heirs" in the third paragraph of the will does not affect the rights of the plaintiff herein. Next, the words "in the event that any person shall contest this will" may include the entire world, and does not name the plaintiff either expressly, or by implication, or show that the testator had her in mind. Reading the whole will, which must be considered together, we find that John R. Brigham recites in the very first sentence of the will that he

is an unmarried man. Now, if he was an unmarried man, obviously, he did not have any children in mind, and the very statement that he said he was unmarried shows that he did not have any children in mind, and he probably regarded the plaintiff's status as foreclosed by her mother's subsequent marriage without a divorce. Next, if she is not named in this paragraph, is she "provided for" in this paragraph? It is hard to see how she could be "provided for" in the said paragraph if she is not named therein. While a testator has a right to disinherit his children, or expressly give them a nominal sum, when he fails to do that and does not expressly disinherit the children or expressly give them a nominal sum, in order to exclude the children, under these circumstances, from inheriting under the statute, they must be actually and substantially "provided for."

Paragraph 3 does not "provide for" the plaintiff herein. In fact, it has no provision for her at all. In order for her to take under this paragraph, assuming that she came within the purview thereof, she must perform a condition precedent before she is entitled to the sum of $5. She must come to court and incur the tremendous expense of proving that she is the daughter of John R. Brigham, and after she has expended several hundred dollars to establish that proposition, then the provision, that is made for her in the will, is that she shall receive $5, assuming that she is named therein.

Now, the words "provided for" never had any such meaning as the authorities show. We again refer to the case of *Purdy* v. *Davis, supra,* where the doctrine of *Bower* v. *Bower,* followed in Oregon, is recognized, and in which the rule is stated as follows:

"Under our statute there must be some substantial provision for the children of which they can legally avail themselves or else there must be an actual naming of such children in the will or the same will be ineffectual as against such children." *Re Barker's Estate,* 5 Wash. 390 (31 Pac. 976).

In *Rowe v. Rowe,* 120 Iowa, 17 (94 N. W. 258), under the same statute as ours, the testator devised all his property to his wife with full management and control for her use, comfort and support as long as she was alive, and at her death the remainder to their children. It was held that the widow took a life estate and that the disposition of the remainder did not constitute a substantial support for the children. The language of the opinion is very appropriate, and reads as follows:

"Appellant's counsel, admitting the rules thus far announced, contend that they do not apply when there has been a recognition of the child, and substantial provision made for it in the will. * * The widow has but a life estate under the will of her former husband, with limited power of disposition for her use, comfort, and support so long as she shall live. Under this power she might sell the entire property during her life for support, and thus deprive the child of any right to or interest therein. Indeed, all the child is given is a remainder after a life estate, and this remainder is subject to disposition under the power given in the will. Is this a substantial provision for the child? We think not."

In *Meyers v. Watson,* 234 Mo. 286 (136 S. W. 236), there was a gift of $10 to James Carey "my son-in-law," whose wife, the daughter of the testator, was dead at the time. This was not a provision for the grandchildren, the court saying:

"We affirm the judgment of the court below. The plaintiffs are neither named, nor provided for in the will. * * The failure to name these children of the testator's deceased daughter raises the presumption that they were unintentionally omitted. * * Had the testator given to the son-in-law a fair proportion of the estate, it might be held that this provision was intended for the grandchildren, and that, consequently they were in the testator's mind, and this because it would not be likely that the testator intended to benefit the son-in-law alone. * * The plaintiffs were not mentioned in the will. We find nothing in the instrument to rebut the presumption that they were unintentionally omitted."

*Grace v. Hildebrant,* 110 Okl. 181 (237 Pac. 98), is a case almost on all-fours with the case at bar. The fourth paragraph in the will reads as follows:

"If there is any person who would be entitled to share in my estate under the law then to each and every person I give and bequeath the sum of one dollar."

The Supreme Court of Oklahoma said:

"If it could be said that said fourth paragraph refers to a class including defendant, there is no substantial devise to that class or to the defendant by the nominal bequest of one dollar. As a matter of law, said will was inoperative as to defendant. * * Under said statute and similar statutes the testator must either name the children or its legal representative or make some provision for the pretermitted person."

12. There is in the instant case no gift made direct. The $5 is upon condition, and unless that condition precedent is met by a contest of the will, the plaintiff is not provided for. No such construction of these statutes has ever been made in any court. The only way that the testator could defeat the rights of the

plaintiff would be expressly to name her in a will or expressly to disinherit her. In the absence of doing these things, unless she is substantially "provided for" in a will, she takes under the statute. Giving her $5, if she should succeed in proving her legitimacy, is so incongruous that no court could reasonably hold that she was "provided for" within the meaning of the statute by such a provision. It is a case where she must die to win. Furthermore, this provision being *in terrorem,* it is void.

The latest case found on this subject is *In re Keenan,* 188 Wis. 163 (205 N. W. 1001, 42 A. L. R. 836). The headnote reflects the substance of the opinion and is as follows:

"It is contrary to public policy to require a litigant to forfeit a substantial sum in case he is not successful in the prosecution in court of a *bona fide* claim or right, such as the contesting of the probate of a will, where the constitution provides that every person is entitled to a certain remedy in the law for all wrongs which he may receive, and should obtain justice freely and without being compelled to purchase it, completely and without denial, conformably to the laws."

Our Constitution contains substantially the same provision as the one alluded to above. In the present case, the testator has gone further and provides not only that there shall be a forfeiture in case of failure to establish the claim, but also in case that such claim is actually established.

In several states, under different statutes from ours, the holding has been as contended for by the respondents. These cases follow the case of *Cooke* v. *Turner,* 15 Mees. & W. 727, and other English cases follow this, but in later English cases the rule has been otherwise.

In *Powell* v. *Morgan,* 2 Vern. 90, the court said:

"There was *probalis causa litigandi,* and it was not a forfeiture of the legacy."

In *Morris* v. *Borroughs,* 1 Atk. 404, it is said:

"There was a provision made by the will that any legatee controverting the disposition the testator had thereby made of his estate, should forfeit his legacy; this was held clearly and to be *in terrorem* only, and that no such forfeiture could be incurred by contesting any disputable matter in a court of justice."

In *Loyd* v. *Spillett,* 3 P. Wms. 344, it was held that legatees contesting the validity of the will were not to be deprived of their legacies because of such contest. The same rule was held in *Smithsonian Inst.* v. *Meech,* 169 U. S. 413 (42 L. Ed. 793, 18 Sup. Ct. Rep. 396, see, also, Rose's U. S. Notes), and the case of *Loyd* v. *Spillett, supra,* was approved.

The case of *In re Keenan, supra,* is reprinted in 42 A. L. R. 836, and contains an exhaustive note on this subject in which the conclusion is reached that such a provision as that above referred to is void as to a party having claims in good faith, and we so hold.

Taking the whole testimony together, we are of the opinion that these parties lived together and treated each other as husband and wife for at least a year before and several years after the plaintiff in this suit was born, but John R. Brigham having to a great extent lost his affection for plaintiff's mother, saw fit to break off the connection and elope with another woman. Later, having become rich, or at least comparatively rich, he sought to be respectable by denying these relations and denying the daughter he had begotten and bred.

A number of citizens were called upon and testified
that they had esteemed him a bachelor, and they were
no doubt correct as the parties engaged in the busi-
ness being conducted in the house of deceased were
not proclaiming their relations to the better class in
the community and no doubt a good many citizens of
Portland could have been called who would have tes-
tified that they had known John R. Brigham in a
business way, and to some extent in a social way, and
that they had always supposed him to be a bachelor.
This is mere negative testimony and entitled to small
weight.

The fact that Mrs. Liddy-Brigham, after deceased
deserted her for another woman, married, and on the
death of that husband married still another, offers a
very plausible argument for defendant, but it is easily
explained. In view of the fact that there had been
no formal marriage ceremony, she probably con-
sidered that it was as easy to exercise the same right
to get rid of a husband, without legal proceedings, as
to obtain one, without going through the ordinary
formalities, and therefore treated the desertion as sort
of a common-law divorce. At any rate, we hear of no
imputation of her ever associating with other men in
a sexual way excepting by the sanction of a marriage
ceremony. It is to be remembered that these people
do not seem to have been schooled in the ordinary
precepts of morality, and the same standards, which
would apply to an educated and refined woman, can-
not well be held to apply to this woman on whom the
conventional relations of society would naturally sit
very lightly.

13. We attach great weight to the verdict of the
jury in this case. It is true it is in its nature perhaps
only advisory and not conclusive, but it is also treated

with great consideration by the courts. As said in *DeLashmutt & Oatman* v. *Everson,* 7 Or. 212, and *Swegle* v. *Wells,* 7 Or. 222, such a verdict should not be set aside where there is substantial evidence to support it.

We do not question the learned judge's capacity to pass upon the law, or the capacity of any judge to pass upon the law, but usually in cases of this kind the average intelligent citizen is as capable of passing upon the facts as the average intelligent judge, and ten jurymen called upon to determine the pure question of fact have found such facts as entitled plaintiff in this case to a decree in her favor. Taking the whole testimony into consideration, and further taking into consideration the fact that ten good citizens have found the facts in favor of plaintiff, we are of the opinion that this case should be reversed and plaintiff granted the relief prayed for in her petition, and it is so ordered.          REVERSED AND DECREE ENTERED.

---

Former opinion adhered to April 24, 1928.

ON REHEARING.

(266 Pac. 875.)

For appellant there was a brief over the names of *Mr. L. A. Liljeqvist, Mr. Thomas Mannix, Messrs. Hoy & Childers* and *Mr. Dan E. Powers,* with oral arguments by *Mr. Liljeqvist* and *Mr. Mannix.*

For respondents there was a brief over the names . of *Mr. John F. Reilly, Mr. V. V. Pendergrass* and *Mr. Charles R. Spackman, Jr.,* with an oral argument by *Mr. Reilly.*

McBRIDE, J.—This case comes again before the
Supreme Court on rehearing.  It was formerly held
by this court in the original opinion following the ver-
dict of the jury in the lower court that Mercedes
Wadsworth was the daughter of John R. Brigham and
that her mother and father had lived together as pro-
vided by Chapter 269, General Laws of 1925, which
reads as follows:

"In case a man and a woman, not otherwise mar-
ried heretofore, shall have cohabited in the state of
Oregon as husband and wife, for over one year, and
children shall be living as a result of said relation,
said cohabitation, if children are living, is hereby de-
clared to constitute a valid marriage and the chil-
dren born after the beginning of said cohabitation are
hereby declared to be the legitimate offspring of said
marriage."

At that time the entire record received the full con-
sideration of the Supreme Court including that of the
late lamented Chief Justice BURNETT, and the court
found no difficulty in arriving at the conclusion that
the plaintiff was entitled to the judgment of this
court, and that she had amply proved all the facts
required.

In the petition for rehearing reliance was mainly
placed on the proposition that the statute was not
retrospective in its nature, and that the parents of
the plaintiff did not live together as husband and wife
in the manner provided for.

14, 15. At the outset we wish to lay down the fol-
lowing general rule for the construction of remedial
statutes:

"In accordance with the general rule that remedial
statutes should be given a liberal construction, they
will be freely construed to have a retrospective oper-

ation whenever such seems to have been the intention of the legislature, unless such construction would impair the validity of contracts, disturb vested rights, or create new obligations. This principle has been applied to statutes for the prevention of fraud, legitimating the issue of void marriages." 36 Cyc. 1209.

The general construction of such statutes is retrospective. In 7 C. J. 948, it is said:

"Statutes intended to legitimate the issue of a marriage otherwise void are remedial in their nature and may properly be applied retrospectively."

A very leading case is *Goshen* v. *Stonington,* 4 Conn. 209, 221 (10 Am. Dec. 121). *State* v. *Adams,* 65 N. C. 537; *Andrews* v. *Page,* 50 Tenn. (3 Heisk.) 653.

In *Goshen* v. *Stonington, supra,* the court said:

"Lastly, the defendants have insisted (and on this objection the principal stress has been laid), that the law of May, 1820, being retrospective, and in violation of vested rights, it is the duty of the court to pronounce it void. The retrospection of the act is indisputable, and equally so is its purpose to change the legal rights of the litigating parties. Whether in so doing this, there has been injustice, will be an inquiry in a subsequent part of my opinion. It is universally admitted and unsusceptible of dispute, that there may be retrospective laws impairing vested rights, which are unjust, neither according with sound legislation, nor the fundamental principles 'of the social compact.' If, for example, the legislature should enact a law, without any assignable reason, taking from A his estate, and giving it to B the injustice would be flagrant, and the act would produce a sensation of universal insecurity. On the other hand, laws of a retrospective nature, affecting the rights of individuals, not adverse to equitable principles, and highly promotive of the general good, have often been passed, and as often approved. In the case before us,

the defendants have expressly conceded, that the law
in question is valid, so far as respects the persons *de
facto* married, and their issue.  But, in that event,
would it not have been a retrospective operation on
vested rights?  The man and woman were unmar-
ried, notwithstanding the formal ceremony which
passed between them, and free, in point of law, to
live in celibacy, or contract matrimony with any per-
son at pleasure.  It is a strong exercise of power to
compel two persons to marry without their consent;
and a palpable perversion of strict legal right.  At
the same time, the retrospective law, thus far directly
operating on vested rights, is admitted to be unques-
tionably valid, because it is manifestly just.''

This language is also quoted in Cooley's Constitu-
tional Limitations (7 ed.), page 533.

Such statutes have been construed to apply to chil-
dren whose parents were dead at the time of the pas-
sage of the act: *Gregley* v. *Jackson,* 38 Ark. 487; *Wal-
lace* v. *Godfrey,* 42 Fed. 812; *Jackson* v. *Lervey,* 5
Cow. (N. Y.) 403.

In *Jackson* v. *Lervey,* 5 Cow. (N. Y.) 397, 403, the
court said:

''The act declares, that all marriages contracted,
or which may thereafter be contracted, wherein one
of the parties was, or might be slaves, shall be con-
sidered equally valid as though the parties thereunto
were free, and the child or children of such marriages
shall be deemed legitimate.  The words are general,
and extend to all marriages.  Why should it be re-
stricted to cases where the parties were then living?
One object was to render the children legitimate.
What superior claims had the children of parents then
living to the interference of the legislature, to those
whose parents were dead when the statute was en-
acted?  I perceive none.  The words of the act are
sufficiently broad to include both; and ought so to be
construed to effectuate the intent.  If I am right in

this construction, then the child of the soldier was legitimate, and became the heir of the father.''

In *Andrews* v. *Page,* 50 Tenn. (3 Heisk.) 668, the court said:

"The act of May 26, 1866, § 5, declares, 'that all free persons of color, who were living together as husband and wife, in this state, while in a state of slavery, are hereby declared to be man and wife, and their children legitimately entitled to an inheritance in any property heretofore acquired, or that may be hereafter acquired, by said parents, to as full an extent as white children are entitled under existing laws of the state. An act similar in principle to this, had been passed some years before, to validate marriages between white persons who had been married under license carelessly issued in blank by the clerks, and containing nothing beyond their own signatures. See Acts 1849–50, p. 397.''

"The power to legitimate children has been frequently exercised by the legislature, at the instance of the father, and was delegated to the circuit and county courts by the act of 1805, c. 2 Car. & Nic. 499. It may be still exercised under the code 3640, 3643. These statutes, when not interfering with vested rights, have always been permitted to have a retrospective operation. See Cooley on Lim. 372, 373, 360, 361.''

"The act of 1866, having been passed to ratify marriages, good during the institution of slavery, by the prevailing usage of this state, and to create a right of inheritance conformable to such usage, and the changed condition of the slave, was in furtherance of good morals, and of the best interests of the state; and where no other rights have intervened, was eminently constitutional and proper.''

That retrospective legislation is not strange in Oregon is evidenced by the many statutes found in the index of the Oregon Code making valid many defects in prior proceedings, such as divorce, defects in con-

veyances of land, marriages and such other matters. In *McCalla* v. *Bane,* 45 Fed. 828, the Oregon act, Section 10128, making illegitimates of the mother legitimate, was construed retrospectively and held valid. See Section 723 and Section 2563, Or. L., and *Wallace* v. *McDaniel,* 59 Or. 378, 385 (117 Pac. 314, L. R. A. 1916C, 744).

It was found after the decision of the Supreme Court in *Huard* v. *McTeigh,* 113 Or. 279 (232 Pac. 658, 39 A. L. R. 528), declaring common-law marriages invalid, that there were many children born in the State of Oregon who without some curative legislation would be considered as bastards both in fact and in law, and so to meet this exigency the aforesaid statute was enacted.

The primary purpose of the act was to legitimatize ill-begotten children, and the provision that the parents should be considered married if the children were living as a result of the relations mentioned in the statute was merely incidental to this great purpose. The purpose of the act was not to restore common-law marriages in Oregon, but to legitimatize the children begotten of illicit relations, provided the parents lived together for a sufficient length of time to avoid any presumption that the claim of the child might not be well founded.

16. The evil to be overcome by the police power of the state was the fact that there were illegitimate children born who would not inherit from the father and who had no name. It was this evil that gave rise to the legislation and not any defects in the marriage system of Oregon. Therefore, in construing this statute we must look at the evil which the legislature sought to correct and not go out of our way to defeat its purpose by any fancied or strained ideas

that the ill-gotten children must prove all the elements of a common-law marriage as a condition precedent to establish legitimacy. The legislature did not so provide in the statute and it is our function to follow what the legislature declared to be the law rather than fritter it away, with imagined technicalities and thus destroy its beneficial purpose.

And as the validity of Chapter 269, Laws of 1925, has been challenged under the state laws, we will first take up the question of its validity.

17–19. It is always a delicate matter to declare a statute duly enacted by the legislature unconstitutional and unless the conflict between the Constitution and the statute is clear the court will not declare it void. This statute was passed under the police power of the state. Such power is exclusively vested in the legislature and covers all laws relating to the public health, morals and welfare. It is only when fundamental rights which are beyond the scope of the police power are interfered with that the court under the Constitution protects such rights from the excess of power. But no such case arises here, for it is too plain for argument that the statute is within the scope of the police power being merely a curative statute enacted for the humane and laudable purpose of legitimatizing the offspring of parents whose relations were irregular and not sanctioned by law. Such statutes are favored in law and are liberally construed to effectuate the purpose of their enactment. And it is a well-known rule of statutory construction that if a statute is capable of two meanings, one which would uphold it and the other deny it, the court will uphold its validity: *Texas* v. *Eastern Texas R. Co.,* 258 U. S. 204 (66 L. Ed. 566, 42 Sup. Ct. Rep. 281); *United*

*States* v. *Delaware, etc.,* 213 U. S. 367 (53 L. Ed. 836, 29 Sup. Ct. Rep. 527.)  A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts on that score: *Panama Ry. Co.* v. *Johnson,* 264 U. S. 375 (68 L. Ed. 748, 44 Sup. Ct. Rep. 391).

20. In construing a state statute the Supreme Court of a state cannot usurp the power of legislation.  Under our system of laws no department of the government can transcend the law of its creation.  It is for the legislature to amend and make laws and for the courts to construe them.  The court cannot usurp the functions of the legislature any more than the legislature can usurp the functions of the court.

And courts are bound to follow the plain words of a statute as to which there is no room for construction regardless of the consequences: *Commissioner of Immigration* v. *Gottleib,* 265 U. S. 310 (68 L. Ed. 1031, 44 Sup. Ct. Rep. 528).

But it is said that the legislature has no power to marry persons against their will.  That is true.  But this statute does not do that.  It gives effect to the will of the parties.  If a man and woman voluntarily live together as husband and wife, either in appearance or reality, for the statutory period of one year, and children are born as a result of such relation and other rights have not intervened, the legislature in the exercise of its police power has only placed on the conduct of the parties what they themselves consented to and invited; and the police power in the exercise of a wise and humane policy will not allow such parents to bastardize their innocent offspring out of any refined regard for their supposed rights which they

had forfeited by their illicit relations, and this law is well settled, and by the highest authority. See Cooley's Constitutional Limitations (8 ed.), p. 777.

21. But even if this were not true and it was the law that the state in the exercise of its police power could not in any event declare parties married who had by their illicit relations brought innocent children into the world under the cloud of bastardy in order to give such children a name, nevertheless we would hold that the plaintiff was still entitled to recover in this case under the well-established rule that when the different parts of a statute are separable, one part may stand without affecting the validity of the other part. This rule has been recognized in Oregon even in a criminal statute in the late case of *State* v. *Ring,* 122 Or. 644 (259 Pac. 780), recently decided, where it was held by this court, speaking through Mr. Justice COSHOW, that the conviction of the defendant in that case could be upheld although it was admitted that Section 2189, Or. L., was in conflict with the federal law, and if inseparable was void, but, in upholding the conviction, Mr. Justice COSHOW said with the approval of the court:

"It would not be helpful to the profession to restate the reasons assigned, both by this court and the United States Supreme Court, for sustaining the validity of such legislation as said section 2189 Or. L. * * The statute is not uncertain. A pilot of ordinary intelligence can readily determine from section 2189 Or. L., and section 4444 U. S. Revised Statutes, when he will require a state license and when a government license. * * So much of said section 2189 as conflicts with title 52 c. 1 Rev. Stat. (46 U. S. C. A., sec. 361 et seq.), (U. S. Comp. St., sec. 8151 et seq.) is dormant and unenforceable, but is not unconstitutional."

Further, in *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601, at page 635 (39 L. Ed. 1108, 15 Sup. Ct. Rep. 912), Mr. Chief Justice FULLER said:

"It is elementary that the same statute may be in part constitutional and in part unconstitutional, and if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected."

22, 23. So that even if the legislative marriage of the parties, voluntarily engaging in illicit intercourse, and begetting children as a result thereof, was a matter beyond the police power of the state to create, such lack of power would not prevent the other valid part of the statute from standing on its own ground, for it is a proposition too plain for argument that the legislature can declare the children of illegitimate relations legitimate without marrying the parents as a condition precedent. See *McCalla* v. *Bane*, 45 Fed. 828. One thing does not depend upon the other. Therefore the marriage of the parents and the legitimatizing of the children are two totally independent things. We advance this consideration for the purpose of showing that the statute is valid in any event as to its main object. Both the father and mother of this plaintiff are dead and whether they became married by the statute or not under these circumstances would not be decisive, or make any difference. But we do not choose to put our decision on this ground, as we have no desire to attempt to fritter away any of the legitimate powers of the legislature of this state by any forced or strained construction of statutes passed in the exercise of the police power. We hold, therefore, the statute as a whole is valid.

And so we will take up the proposition advanced by the defendants that the plaintiff did not prove that

her parents cohabited in the State of Oregon as husband and wife for over one year. This seems to be the backbone of the defendants' case. It is not contended that Mercedes Wadsworth is not the daughter of John R. Brigham, nor is it denied that she was born in 1879; nor is it denied that her mother was a widow at the time of her birth; neither is it denied that her mother had been a widow for a period of approximately over eleven months immediately preceding the birth of this plaintiff, and during her relations with John R. Brigham she remained a widow for several years so far as a formal marriage ceremony was concerned up until 1883. That there were intimate relations between John R. Brigham and the plaintiff's mother is not denied. As a matter of fact, practically every witness called by both the plaintiff and defendants admitted that these relations continued and existed during the period of time preceding the plaintiff's birth and for several years thereafter. So that every fact connected with the birth of this plaintiff and her early infancy and the relations of her parents is proved beyond question, except the proposition is disputed that the parties in the execution of these relations "cohabited as husband and wife."

In determining the meaning of the words in the statute "cohabiting as husband and wife," we find in looking at the authorities that these words are capable of different meanings. In some cases the words "cohabiting as husband and wife" are held to mean that, if the parties live together in such a manner as to appear to be living as husband and wife, the requirements of the statute are satisfied. In other cases, and generally where common-law marriages are only in-

volved, the meaning attributed to the words is that the parties must be matrimonially inclined.

In this case we held in the former opinion that, if a man and a woman lived together during the statutory period and children were born to such illicit relation and were living, and that such parents had cohabited in the manner of husband and wife regardless of their formal intent, the requirements of the statute were satisfied and the children were made legitimate. We think that this was the intention of the legislature, considering that the purpose of the statute was to legitimatize the children of such illicit relations, and that the marriage of the parents in such cases was only incidental and could only come into being in the event that children were living and in no other case. It would seem that loading this statute with unnecessary refinements is subversive of the intention of the legislature, and that, if a child is born as a result of illicit relations continued during the statutory period, the court will not be required to pry into the secret psychological processes existing in the minds of the parents at the time; but that the statute is satisfied if its actual requirements were proved. We are not prepared to recede from the position that we took in our former decision regarding the meaning of the words "living together as husband and wife."

We might say in this case, however, that the evidence did prove that the parties lived together as husband and wife even in the most formal sense, and that they fully intended to live together as husband and wife in the common-law sense is so declared by evidence which is uncontradicted. John R. Brigham, the father of the plaintiff, as the record in this case conclusively shows and as the jury found, admitted both to the plaintiff and Mrs. Britten and to his

friend and fellow townsman, John Doud, that he was a married man and this plaintiff was his daughter. Now it is too plain for argument that when a man himself admits the nature of his illicit relations, there is no room for speculating or guessing that these relations were of some other nature than as described by him. So far as putting the stamp of a common-law marriage on his relations with the plaintiff's mother in this case, John R. Brigham condemned himself out of his own mouth, if we are to give any credence to the evidence which is uncontradicted and to the findings of the jury.

But it is claimed that the plaintiff does not remember the events occurring at her birth or for some time thereafter. That is true, and we are unable to state any particular age at which a child remembers events, but when this plaintiff became older, and for several years, she was at all times in constant communication with John R. Brigham and he admitted, as the evidence shows, to everyone, with hardly an exception, that the plaintiff herein was his daughter, and he always treated her and recognized her as such. His admissions, the family album, and the signature of John R. Brigham in his own handwriting acknowledging his parenthood is not open to impeachment. It is natural for people to be interested in their family history, and in matters of this kind it is a general rule that everyone knows his family history better than anyone else, and, therefore, the statement advanced by defendants, that the plaintiff could not remember things immediately connected with her birth, is beside the question, for the subsequent admissions of John R. Brigham, the family album and the evidence of the other witnesses fully corroborated the plaintiff in every respect and overwhelmingly proved that she

was the daughter of John R. Brigham, which is un-
questioned, and that her parents had complied with
all the requirements of the statute in every respect
and to the minutest degree, and with a preponder-
ance of the evidence which would satisfy the require-
ments of a criminal statute.

And as against this mass of evidence the defendants
only introduced the opinions and the reputation of
John R. Brigham in the early days of Portland. This
is negative testimony of the flimsiest kind and can have
but little, if any, weight against the positive testimony
of the plaintiff and her witnesses. This brings us
to the question as to the weight to be given to the
jury verdict in this case.

24. The policy of this state has been declared by
constitutional amendment that in actions at law the
findings of a jury on a question of fact are conclusive.
While this constitutional amendment does not apply
to suits in equity, it nevertheless shows the policy of
the people of the State of Oregon acting in their
sovereign capacity. In equity suits the law was
early laid down as follows:

"That while the verdict was 'not conclusive upon
the courts it should not be set aside unless clearly
against the evidence.'" *Swegle* v. *Wells*, 7 Or. 222,
226.

In *De Lashmutt* v. *Everson*, 7 Or. 212, 219, the rule
was stated as follows:

"This court further held that where a verdict has
been taken in such cases in the court below it comes
up with the transcript on appeal and may be read in
evidence, and while not conclusive upon the court it
should not be disregarded unless clearly against the
evidence."

25. The jury in this case were called upon to decide the issues of fact. The trial continued for many days and was bitterly contested. The jury had an opportunity to see the witnesses and hear them and they were in the atmosphere of the trial. We have nothing to guide us here but the cold record. We cannot see or hear the witnesses or judge of their veracity except from the printed record. Under such circumstances, we feel that we would be assuming a heavy responsibility in setting aside the verdict of this jury and declare this woman a bastard, after the jury by satisfactory and competent evidence had rendered a verdict establishing her legitimacy.

Under these circumstances, we do not believe that we have any right to usurp the functions of the jury and say that they were wrong in favor of the evidence presented by this record.

Regarding the salient facts in this case and without attempting to review the transcript of the evidence, which covers 660 pages together with a group of exhibits, we will call attention to the following excerpts from the testimony.

The plaintiff gave the following testimony:

"Q. Now, have you ever heard your father or mother talk about the time of your birth? A. Well, I heard them say that they were married in California.

"Q. Do you know how long before your birth they were married? A. I think it was in 1878.

"Q. And how long did they live together at that time if you know or have you ever heard them. A. (Interrupting.) Well, they were very happy until about * * when I was four years old, when there was some little disturbance.

"Q. How do you know that? A. Well, from what father said and mother said.

"Q. To what extent did you correspond with him during his lifetime.  A. Up to the time of his death practically.

"Q. How frequently did you hear from him.  A. I generally got a letter about once or twice a week.

"Q. Now you have said that you were born in Portland; that your folks told you that you were born in Portland.  Do you know where in Portland they said you were born.  A. I don't know whether it was in the Reed residence or Reed Block, there was something about a Reed place."

She testified that she was always known and went under the name of Mercedes Brigham.

Then follows this testimony:

"Q. Have you heard your father and mother say how long they lived together after they were first married, before you were born?  A. No, not particularly, 'til this trouble came up, when I was about five.

"Q. That would be about how many years?  A. About five years.

"Q. Did you have any conversation, or ever have any conversation with him about that particular incident, when he went back to New York, and if so, just tell the jury what he said to you about it.  A. He said he was awfully sorry, because he had made a mistake, that he hadn't treated mother different.

"Q. How many times did he talk to you about that.  A. Well, you see it seemed to kind of prey on his mind, in regard to that one incident.

"Q. Did he talk to you about it quite frequently then?  A. Different times, he would, and he would cry about it.

"Q. What was his temperament as to being nervous or otherwise?  A. He was of a very nervous disposition, and he shook quite a bit, just like I do sometimes.

"Q. Now, in these conversations with your father and your mother, and particularly your father, about their living together prior to your birth, how long

did they say they had lived together before you were born. A. Well, he told me they were married in 1878.

"Q. Yes; well, how long did they—did they go to living together when they were married? A. 1878, and I was born in 1879.

"Q. And did he say that they lived together during that time? A. Yes, sir.

"Q. And in months or years, how long did he say they had lived together prior to your birth? A. Up to the time they had that little difficulty when I was about five years old.

"Q. That is after your birth, Mrs. Wadsworth? A. Yes.

"Q. But prior to your birth, for how many months did they live together—for more than a year? A. Yes, for more than a year.

"Q. For more than a year, and after your birth, then as I understand you, they lived together happily, so they said. A. (Interrupting.) Yes, so they said.

"Q. (Continuing.) —up until this New York trip."

Then as illustrating the relation of the parties we find in the record the following letter dated September 26, 1923, from John R. Brigham in his own handwriting, reading as follows:

"Portland, September 26th—3 P. M. 1923.

"Dear Sadie: I was surprised to get the nice fruit from you. It is awful kind in you to remember me so kindly and how can I ever pay you for it. I looked over all of my mail to see how you want me to address your mail. The fruit was fine and to think from poor mothers farm at the Dalles and she so long worked. Oh I wish she of put it all in shape as she left it & had it on record. No one knows what I did for her. God help her. Beloved love to all. Sadie I expect to go to San Diego the last of this week. you can drop me a few lines direct here at Perkins Hotel Portland and your name so I can address proper, yours

"J. R. BRIGHAM."

Then the following questions and answers occur:

"Q. Now, during this time that your mother and father and you were living together, how did they speak to each other? That is to say, how did they address each other, when they talked to one another? A. Well, they had little nicknames for one another, like all families do.

"Q. How did they refer to one another? How did they refer to one another when speaking to you. What for instance, would your mother call John R. Brigham, how would she refer to him? A. She always said 'Papa' or 'Pop.'

And to show how this daughter addressed her father, the following is taken from the record:

"My dear darling papa: Trust you arrived safe. Its sure a long tiresome long trip. Do hope you are feeling better by now. Am enclosing you a picture of dear mother's grave. It was taken on her dear birthday, Jan. 1. Oh how I do miss her dear more than words can tell or express to you. It's so lonely without her. As I am all alone in this world it's sure sad. My heart so heavy. Today I went up the creek and bought a nice male duck, so as to raise some little ones. When I was down to Portland I got some of those old fashion peach plums like dear grandpa had, two dozen; mother didn't have any. I always liked them. Also got forty prune trees to fill out where some that died. And fifty apricot trees. And six cases of dynamite to blow out some stumps and clear the good land; plant potatoes this spring and then in the fall, trees. As it not good a long to be idle. Mother dear only had a few old hens and they were about eight years old, so I got some new strain as to get eggs next winter. When the market is good I must close dear. And trust these few lines will be of cheer to you dear, as I am sure lonely without "you." My dear mother the boys join in sending their regards,

"Your lonely little girl."

Then regarding her mother's death, we find the following letter from John R. Brigham in his handwriting:

"Dear Sadie: I have been trying to drop you a few lines. Oh, that must of been awful shock to you. Oh, how I wish I could have seen her to have a talk with her and now we don't know what will be done with all of her income that she got for the forty years she worked for. I will try and come up to Portland next week and if I do I will come and see you, but will let you know. Now Sadie, be good and you will have lots of cash, so you don't worry. Oh, if we could talk; and I am all on a tremble; have had so many and so busy, I have come from San Diego; went to get away from the people; and I am in it worse than ever, but you tell them I will come and you and I can see how the disposition of the whole thing is. Now Sadie, don't work too hard nor worry. God bless you. It will be about two weeks before I go to Portland. Goodby, lots of love, Excuse all.

"J. R. BRIGHAM."

It also appeared in the evidence, and was uncontradicted, that John R. Brigham frequently took trips with the plaintiff's mother to The Dalles; that, during the period of plaintiff's infancy and while they were living in Portland, they also took a trip to San Francisco, and that plaintiff's mother was known as Mrs. Brigham in The Dalles and in San Francisco.

The following also occurs in the evidence:

"Q. Then as a matter of fact, you don't personally remember this alleged living together of your mother and father during the first eight years of your life, do you? A. Oh yes, I do.

"Q. How old do you consider a little girl? A. How old do you consider a little girl; I always knew him as daddy from three years; I always called him daddy, when I began to talk."

It further appears in the testimony that John R. Brigham told his daughter that they were married in 1878.

This witness also testified to living at the different hotels with her father and mother during her infancy. She also testified that they lived together as husband and wife.

Referring to the plaintiff's mother, the following occurred:

"Q. Well I am asking you now was she called Mrs. Brigham before she went to California? A. Yes.

"Q. Where was she known as Mrs. Brigham? A. At The Dalles and here and San Francisco.

"Q. In other words you didn't live with your mother and Mr. Brigham from the time you were born until the time when you were six years old did you? A. Oh yes, oh yes.

"Q. As I get it then, from 1880 to 1886, Mr. Brigham and Mrs. Liddy and yourself occupied quarters together in the St. Charles Hotel, is that right? A. Yes, sir."

Mrs. Mary K. Britten corroborated the plaintiff as follows: She testified that she had lived at The Dalles for forty-six years and was acquainted with John R. Brigham during his lifetime as well as Mrs. Wadsworth. She further testified that she first knew the plaintiff when she was possibly a year old or more, and that she saw them at The Dalles, Oregon.

"Q. Now, just tell the jury Mrs. Britten, what took place at that time, at that meeting. How you met him and what happened. Who was there and all about it. A. Well I just came from the boat from New York state and we stopped at the Umatilla House and my sister was with me, and we went in and sat down. They were expecting the news about Garfield's election and we all went in there and sat down and we happened to sit in a seat next to Mrs. Wadsworth's

mother, and my sister introduced me to Mrs. Liddy, and she says, her name was Liddy at one time, but she said, 'Excuse me,' she said, 'It is Mrs. Brigham.'

"Q. Was John R. Brigham there at that time? A. He was sitting next to her.

"Q. What did he say or do, if anything? A. And my sister asked him, 'Are you married?' and he said, 'We are,' and she said, when my sister introduced me, she said, 'if you please I am not Mrs. Liddy I am Mrs. Brigham. This is my husband, and we asked him if he was married and he said 'We are,' and he picked up the little girl and held her up and he said, 'Look at our marriage certificate.' "

She further testified that she visited the Brighams in Portland and also testified as to the horsewhipping that Mrs. Brigham gave Mr. Brigham, and then told of the most affectionate meeting of father and daughter in the hospital.

"Q. Did you ever hear anybody at The Dalles call her Mrs. Brigham? A. Yes, sir.

"Q. Who? A. Well, when she was introduced there.

"Q. Was that the only time? A. I have heard people down here in Portland too. * *

"Q. Who all were in there at the time? A. Mr. Brigham and Sadie and Liddy.

"Q. You called her Liddy then, did you? A. Well, she is Liddy since; I called her Mrs. Brigham then."

Thomas A. Doud testified as follows: That he was born in Binghampton, New York, in the same town that Mr. Brigham was born and knew Brigham and his people. He testified that John R. Brigham told him "that he had some nieces and brothers and also a daughter at The Dalles, Oregon."

"Q. And did he say anything about leaving any money to the daughter? A. He did.

"Q. What did he say about that? A. He said that he wanted to leave her something and he was going to make arrangements under the will to leave her something. * *

"Q. That was the first time you ever heard he had a daughter? A. Oh no, not the first time.

"Q. When was the first time you ever heard of it. A. I couldn't state that; I always heard that the general rumor was here that he had a wife and daughter.

"Q. Do you recall definitely that he said that his wife was dead? A. I do.

"Q. You do. A. He called the girl his daughter and he said that her mother was dead.

"Q. Well, that isn't his wife? A. That's what he said, his wife.

"Q. He said, 'Her mother is dead,' now, didn't he? Now just recall this conversation. A. Well, I am positive he said 'his wife.'

"Q. You said the first time 'her mother.' I just want you to get it straight. A. Well, I would say it was his wife.

"Q. You recall that? A. Yes."

John F. O'Connor testified, speaking of John R. Brigham:

"Q. Do you know whether he had any family or not? A. Well, all that I know is what I heard, that he had a family yes, and had a daughter.

"Q. What was his reputation at that time as to his marital status, that is was he known as a bachelor or a married man. A. Well, I supposed that he was married. I had heard that he had a daughter. * * Well I heard it around from people talking you know together. I would hear a remark that he was married and he had a daughter. * * I can't recall it exactly, but it was brought out that old John had a wife and daughter here."

R. R. Morrill testified as follows:

"Q. What was the reputation in that respect? What was the understanding in the community?

A. The general understanding about the store where I worked was that she was his girl, and he was her fellow; that was about the way we understood it.

"Q. When you say she was his girl and he was her fellow, what do you mean with reference to that; that they were simply keeping company in an orderly or in the ordinary way? A. Oh no, I mean more than that.

"Q. Well—A. (Interrupting.) Well, he was a bachelor, and that she was his lady, or his woman, while they were not married, as a matter of fact, they should be; now, that's about what it means.

"Q. Mr. Morrill, when you say that her reputation was bad, do you mean to state that she had the reputation of being promiscuous with men herself, or did she—or whether her reputation was bad for the character of the business that she was engaged in. A. I never thought that she had promiscuous intercourse herself with men."

John A. McQuinn testified as follows:

"Q. Now do you know what the reputation of Mrs. Liddy was as to having any other man intimate with her except Mr. Brigham? A. None. I am not familiar with the lady at all, I don't know anything about that part of it; although my general impression would be that they were about as near man and wife as that class of people would ever be."

Without attempting to quote from the mass of testimony given in this case, the foregoing is sufficient to illustrate the relation of the parties, and as all the evidence in this record has all the earmarks of truth, we are satisfied to let the verdict of the jury stand.

26. But the defendants finally say that in order to come within the scope of Chapter 269, Laws of 1925, there must be an actual agreement between the parties engaged in the illicit intercourse that they are living together in the relation of husband and wife before

the statute can operate to legitimatize the offspring of this irregular union, and that they must believe that they are married people, and that they must hold themselves out generally to the world as being married in order to satisfy the terms of the said statute. But this harsh construction of this curative statute would nullify it by what would amount to judicial legislation for the simple reason that the statute itself contains no such requirement. We cannot write words into the statute which are not there, and we cannot make this class of common-law relations any holier than they are, nor are we interested in their moral aspects beyond the fact that we are required by the legislative power of this state to legitimatize children born of irregular unions if the parents cohabited together as husband and wife for the statutory period, and this cohabitation does not require any of the formalities of the common-law marriage except those mentioned in the statute. It must be remembered that the legislature could legitimatize bastard children without any marriage of their parents whatsoever, and it would seem an absurd, unjust and uncalled for construction to put on this statute that the parents must make an actual agreement as to their relations, and that if they failed to do so the legislative act does not work and the children are still bastards.

27. It is the exclusive function of the legislature to make laws, that is, to declare what the law shall be, and, accordingly, acts passed by the legislature may not be enlarged in scope, added to, abridged, amended or otherwise changed by the judiciary. " * * A construction contrary to the obvious meaning of the language used is an encroachment on the legislative power." 12 C. J. 883–885; *Chicago, M. & St. P. R.*

*Co.* v. *Westby,* 178 Fed. 619 (47 L. R. A. (N. S.) 97); *State* v. *Smith,* 56 Or. 21 (107 Pac. 980); *Libby* v. *Olcott,* 66 Or. 124 (134 Pac. 13).

In *State* v. *Smith,* 56 Or. 21, 29 (107 Pac. 980, Mr. Justice KING said:

"It is not the function of courts to make laws, but to interpret them. As summarized by Mr. Justice BEAN in *State* v. *Simon,* 20 Or. 365, 373 (26 Pac. 170, 172): 'Courts must not even, in order to give effect to what they may suppose to be the intention of the legislature, put upon the provisions of a statute a construction not supported by the words, even although the consequences should be to defeat the object of the act.' Smith's Stat. Const., sec. 714."

Mr. Justice WOOD said in *Hobbs* v. *McLean,* 117 U. S. 579 (29 L. Ed. 94, 6 Sup. Ct. Rep. 876, see, also, Rose's U. S. Notes):

"We cannot insert the exception. When a provision is left out of a statute, either by design or mistake of the legislature, the courts have no power to supply it. To do so would be to legislate and not to construe."

28. But it is said that during this period of cohabitation John R. Brigham had rooms elsewhere. That would not prevent his cohabitation with the plaintiff's mother, as cohabitation does not mean that the parties must live together in the same room continually or occupy one room, as the essence of cohabitation is the living together and the sexual relations, and there may be some degree of living apart and an occasional trip away without destroying the relation, so that it was not a part of the plaintiff's case to prove that the three of them were huddled in one room all the time and never departed therefrom.

The claim that the plaintiff must have proved an agreement between her mother and John R. Brigham

in order for her to come within Chapter 269, if assented to, would be judicial legislation. It would take away from the plaintiff her vested rights under this statute.

There is much criticism of the plaintiff's testimony because of some discrepancy in dates and incidents, but it is to be remembered that the plaintiff was forty-eight years of age when she testified and as to many of these dates and incidents she was testifying as to matters that happened when she was a very young child. We have examined her testimony over and over and, while it is true that such discrepancy exists, and that her recollection may be unconsciously colored by her interest in the case, the warp and woof of her narrative is true.

As stated in the original opinion, we hold that the negative testimony for the defense is of small value. It is no doubt the case that five hundred witnesses, who knew Brigham in his lifetime, could be called to testify that they knew Brigham and never heard of him being a married man. As a rule they were not of his class in life. The doings or relations of a landlord of an assignation house were a matter of profound indifference to them. They knew him in a business way, knew that he conducted a hardware store and greeted him when they met him, but that was presumably about all.

The writer is probably acquainted with nearly a thousand lawyers in Oregon, but if he were called upon to say whether a particular attorney was a married man or a bachelor, he would be able to answer perhaps as to one in ten, and as to the others, he would have to say, "I never heard of him being a married man," although he might in fact be married and have a large family of children.

The statute in question has been treated by the defendants as though the most important matter was to legitimate an irregular union of man and woman; but this is merely secondary to the great object, that of removing the stain of bastardy from innocent offspring. These are the real sufferers which the statute wisely seeks to aid, and as to them it should be liberally construed not only in their behalf, but as a warning to the lustful that they cannot live and cohabit with a weak woman, beget children by her and hold her out as a wife so long as her charms last, and when these have faded, to repudiate these relations and leave her and the innocent offspring helpless to bear the opprobrium of bastardy.

There are many incidents alluded to in the original opinion which tend to support the theory that Brigham and plaintiff's mother lived together as man and wife, but it is needless to again recount them here. They satisfied the jury which found its verdict accordingly, and which verdict should not be lightly set aside.

29. Under the old English equity practice the right of an heir at law to demand a jury on the question of legitimacy was a matter of right: Adams' Doctrine of Equity (8 ed.), p. 377; Daniell's Chancery (6 ed.), vol. 2, p. 1075. This court practically held otherwise in *Stevens* v. *Myers*, 62 Or. 372 (121 Pac. 434, 126 Pac. 29) ; but, while the right to such a jury is now discretionary and its verdict only advisory, it should not be disregarded except when clearly against the weight of evidence. See authorities quoted in the original opinion.

While it would be going too far to say that the rule in equity cases should be analogous to that applied by the Constitution to actions at law, namely, where

there is any evidence to support the verdict, it should not be disregarded. Yet, that provision indicates the trend of modern thought and justifies the statement that only where a verdict is clearly against the weight of evidence should it be disregarded. As abundantly shown, such is not the case here.

The original opinion is adhered to.

RAND, C. J., and BEAN and BROWN, JJ., concur.

RAND, C. J., Specially Concurring.—I concur with Mr. Justice McBRIDE because I believe that the construction which should be given to Chapter 269, Laws of 1925, is the direct opposite of the construction attempted to be placed upon the act by Mr. Justice CoSHOW in his dissenting opinion. The title of the act is "To legitimatize certain marriages and children the issue thereof." The act provides:

"In case a man and a woman, not otherwise married heretofore, shall have cohabited in the state of Oregon as husband and wife, for over one year, and children shall be living as a result of said relation, said cohabitation, if children are living, is hereby declared to constitute a valid marriage and the children born after the beginning of said cohabitation are hereby declared to be the legitimate offspring of said marriage."

There is nothing in the title to show that lawful marriages were intended to be the subject matter of the act. In fact, it is clear that lawful marriages and the issue of such lawful marriages were already and always had been legitimate. Nor is there anything in the title or in the enacting clause showing an intent to legitimatize only that class of marriages—not recognized as lawful in this state—which is commonly

referred to as common-law marriages. Nor has the act the effect of legitimatizing common-law marriages except in case there are living children the issue of such marriage. The object and purpose of the act, as indicated by its title and its enacting clause, is to legitimatize the relations existing between an unmarried man and an unmarried woman who have cohabited together as husband and wife for over one year and, as a result of such relations, children have been born and are at the time living. The language of the act is sufficiently broad and comprehensive to include that relationship whether the elements of a common-law marriage existed or not.

The phrase "cohabited in the State of Oregon as husband and wife" does not necessarily alone mean that the man and woman must have contracted to become husband and wife, or had declared themselves to be husband and wife, or were holding themselves out as husband and wife, but was also intended to include the case where a man and a woman had been living together and sustaining such relations with each other as they would have sustained if they had been husband and wife and children had been born of such union and were living at the time the act went into effect. In the latter case as well as in the former, the statute intended to create a marriage relation between them in order to make the children born as the issue of their union legitimate. The primary purpose was to protect the children, if there were any such living, by creating a marriage relation upon the part of the parents of such children. The title is sufficiently broad to accomplish that purpose. If there was a lawful marriage, there was no necessity of legitimatizing it. It was only in case there was no marriage and children had been born and were then living that

the act was to operate, in which event the statute intended to make a valid marriage of such relationship and to legitimatize the children born from the relationship. Before the passage of the act, the children were illegitimate. Upon its passage, the children were legitimatized, and I think the construction attempted to be placed upon the act by Mr. Justice Coshow is too narrow and restricts the operation of the act far beyond that intended by the legislature.

COSHOW, J., Dissenting.—This suit was submitted on briefs and decided September 14, 1927. The opinion is reported in 259 Pac. 299. A rehearing was granted and the case presented here on oral argument February 14, 1928. It is unnecessary to repeat the facts stated in the former opinion, except as that may be required in order to make clear the reasons for the conclusions reached by the writer of this opinion. Such facts as are so required will be stated in the opinion.

This case requires a construction of Chapter 269, General Laws for 1925. This law originated in the Senate and was designated Senate Bill No. 234. Its title is:

"To legitimatize certain marriages and children the issue thereof."

Its purpose was to legitimate marriages and that purpose is expressed as follows:

"In case a man and woman, not otherwise married heretofore, shall have cohabited in the state of Oregon as husband and wife, for over one year, and children shall be living as a result of said relation, said cohabitation, if children are living, is hereby declared to constitute a valid marriage and the children born after the beginning of said cohabitation are hereby

declared to be the legitimate offspring of said marriage.''

Our Constitution, Article IV, Section 20, prescribes:

''Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title. * * ''

The title to the act now designated by said Chapter 269 specifically states the purpose to be to legitimate marriages. Reading the statute in the light of the title, the language ''not otherwise married'' and ''shall have cohabited in the State of Oregon as husband and wife'' must be construed to require the parties to have lived together as husband and wife. The primary meaning of the word ''cohabit'' is ''living together.'' A father cohabits not only with his wife but his children who are living in the same dwelling. In a sense any two people who are living in the same habitation are cohabiting. To cohabit as husband and wife, however, means not only living together but also entertaining that intimate sexual relation which can only be entertained lawfully between husband and wife. Such cohabitation must be general, open, public, regular and uniform under an agreement between the parties to sustain the marital relation.

''To cohabit is to live or dwell together, to have the same habitation, so that where one lives and dwells, there does the other live and dwell with him, but the conduct of the parties, in order to constitute evidence of marital consent, must, generally speaking, be something more than mere living together; it must be an association, consciously and openly, as husband and wife. It is not a mere gratification of sexual passion; nor casual commerce between the parties, for no presumption can elevate concubinage of whatever duration to the dignity of marriage. It must be a matrimonial

cohabitation, entered into with a view of becoming husband and wife, with or without sexual intercourse between them, and it must be a constant and exclusive cohabitation.'' 18 R. C. L. 430, § 58, and numerous authorities cited under the note; Jones' Com. on Ev. (2d ed.), pp. 99, 100; 11 C. J. 949; *McBean* v. *Mc-Bean,* 37 Or. 195, 204, 205 (61 Pac. 418); *State* v. *Naylor,* 68 Or. 139, 144 (136 Pac. 889).

The word ''otherwise,'' as used in the statute, must be given its ordinary meaning. To do that the phrase ''not otherwise married'' clearly harmonizes with the title of the act and requires us to construe ''cohabited * * as husband and wife'' as stating that the man and woman were living under some contract, form or state of marriage. The legislature never intended to elevate a status of concubinage or of lewd and lascivious cohabitation into the sacred status of marriage. The act of the legislature is not an alchemy which can transmute vice into virtue. Where parties, living together under an agreement to so live as husband and wife, openly hold themselves out as such under the belief that they are married, it is competent for the legislature to declare them to be married. Our General Laws define marriage to be a civil contract. Where the parties have directly contracted to live together as husband and wife, they have entered into the civil contract defined as marriage. Our statutes, however, require a marriage to be consummated according to some ceremony or form, evidenced by witnesses and a certificate of some person authorized to perform marriage ceremonies: Or. L., §§ 9720, 9724.

*Huard* v. *McTeigh,* 113 Or. 279 (230 Pac. 658, 39 A. L. R. 528), is authority that common-law marriages are not recognized in the State of Oregon. That case was decided January 27, 1925. Chapter 269 was ap-

proved by the Governor just a month thereafter. We believe that chapter was enacted for the purpose of validating marriages theretofore contracted according to the common law where children were the result of such marriages. It is generally known that a number of such cases existed in the state. It had not been determined by this court prior to the decision referred to above that common-law marriages would not be recognized in this state. Indeed, a federal court held May 3, 1920, that common-law marriages had not been abolished and were not prohibited in Alaska: *Reed* v. *Harkrader*, 264 Fed. 834. Oregon statutes respecting marriages were then in force in Alaska.

We do not intend to hold that said Chapter 269 applies to common-law marriages only. Where a man and woman are living together under any form of agreement intended to evidence a marriage and children are born as a result of cohabitation between them, we believe that their status would come legally within the term "marriage" as used in said chapter, but we believe that there must be an agreement between the man and woman to be husband and wife; they must believe they are married people; they must hold themselves out generally to the world as being married in order to satisfy the terms of said Chapter 269. Nothing less will satisfy the statute.

Most of the cases cited to support plaintiff's position arose among the former slaves in the southern states. While in a state of slavery the negroes could not contract marriage. They did, however, cohabit as husband and wife under conditions evincing an agreement so to do. They did all that they could do under the conditions of slavery to contract marriage lawfully. After they were emancipated,

curative acts were passed by most of the former slave states, declaring the status in which former slaves lived as husband and wife to be a marriage. That marriage was validated and the children legitimated, but in all those cases it was necessary for the parties to have attempted and pretended to have been married and to have cohabited as husband and wife in order to have their status dignified as marriage by said curative statutes: *Wallace* v. *Godfrey,* 42 Fed. 812; *Watson* v. *Ellerbe,* 77 S. C. 232 (57 S. E. 855); *Andrews* v. *Page,* 50 Tenn. (3 Heisk.) 653; *Washington* v. *Washington,* 69 Ala. 281; *Rundle* v. *Pegram,* 49 Miss. 751; *Livingston* v. *Williams,* 75 Tex. 653 (13 S. W. 173); *Rowe* v. *Blackburn,* 152 La. 704 (94 South. 325).

There is respectable authority for holding that a legislature has no authority to declare a man and woman married who have no desire or intention to be married. Marriage is a civil contract. To compel people to enter into a contract against their wills is to deprive them of the right of property. The right to contract within the law is a valuable property right: 13 C. J. 263–265; Cooley, Const. Lim. (7 ed.), 534; *Dunbarton* v. *Franklin,* 19 N. H. 257; *Floyd* v. *Calvert,* 53 Miss. 37; *Bell* v. *Bell,* 196 Ala. 465 (71 South. 465).

Waiving the constitutional question, however, we believe the legislature never intended to declare meretricious relations of a man and woman, without any intention on their part to be married or to live as husband and wife, to constitute marriage.

The contention on the part of the defendants is not that said Chapter 269 was invalid because retroactive. The act is in the nature of a curative act which must necessarily operate retroactively. The contention is that, if we give to said Chapter 269 the construction

contended for by plaintiff, meretricious relations between a man and woman resulting in the birth of children constitute a marriage, regardless of the intention of the parties to such relation. Then it would be unconstitutional, not because it is retroactive only, but because it was an attempt on the part of the legislature to declare a condition a contract against the intention and will of the parties involved. A contract is formed only by the voluntary act of the parties thereto. Conceding that it is possible for the legislature to say that lewd cohabitation resulting in the birth of children will constitute a marriage, it is very doubtful that such an effect could be given to past conduct. Defendants' argument in their petition for rehearing is not that the act is unconstitutional because retroactive but unconstitutional because plaintiff's interpretation of the act would force upon the parties a contract against their will.

"Cohabitation as husband and wife is a manifestation of the parties having consented to contract such relations *inter se*. It is holding forth to the world by the manner of daily life, by conduct, demeanor, and habits, that the man and woman who live together have agreed to take each other in marriage, and to stand in the mutual relation of husband and wife." 18 R. C. L. 429, § 57.

Cohabiting together as husband and wife means living together publicly in the face of society, as if the conjugal relation existed; living in the same house in like manner as marks the intercourse between husband and wife: *Bush* v. *State*, 37 Ark. 215, 218; *Olsen* v. *Peterson*, 33 Neb. 358 (50 N. W. 155); *Taylor* v. *Taylor*, 10 Colo. App. 303 (30 Pac. 1049); *Robinson* v. *Robinson*, 188 Ill. 371 (58 N. E. 906); note to *Becker* v. *Becker*, L. R. A. 1915E, beginning at p. 72; *Adger*

v. *Ackerman,* 115 Fed. 124, 126; *In re Comly's Estate,* 185 Pa. 208 (39 Atl. 890); *Travers* v. *Reinhardt,* 205 U. S. 423, 436 (51 L. Ed. 865, 27 Sup. Ct. Rep. 563, see, also, Rose's U. S. Notes).

Evidence of a common-law marriage or that parties who have been cohabiting as husband and wife without having been formally married, in fact contracted a marriage, must be clear and convincing.

"In such a case the fact of contract is not a 'presumption,' but is a fact proven by circumstantial evidence. Such circumstantial evidence, if clear and persuasive, establishes the existence of the contract of marriage between the parties as satisfactorily as if the contract had been reduced to writing, or had been expressed in the presence of witnesses in the plainest form of contractual words." *Hamlin* v. *Grogan,* 257 Fed. 59.

It is our opinion that the verdict of the jury was not controlling on the judge to whom the case was tried. We think our statute declares the effect of such a verdict.

"Whenever it becomes necessary or proper to inquire of any fact by the verdict of a jury, the court may direct a statement thereof, and that a jury be formed to inquire of the same. The statement shall be tried as an issue of fact in an action, and the verdict may be read as evidence, on the trial of the suit." Or. L., § 404.

This statute defines the force of a verdict of a jury in an equity proceeding. We think it was within the judicial discretion of the Circuit Court to be controlled or not by the verdict of the jury. We do not think that this is the case of an heir at law as used in *Raymond* v. *Flavel,* 27 Or. 219, 232 (40 Pac. 158).

This suit was primarily instituted to prove the marriage of plaintiff's mother to John R. Brigham and her right to inherit from him as the child resulting from said marriage. The heir at law referred to in *Raymond* v. *Flavel*, above, was a special proceeding under the common-law practice: 1 Daniell on Chancery Practice (8 ed.), 666 et seq.; 1 Whitehouse on Equity Practice, 625, § 383.

" * * this court is permitted to go into the record, to look beyond the jury's findings, adopt them, modify them, or disregard them entirely, and determine the case in accordance with the evidence as presented." *Croker* v. *N. Y. Trust Co.,* 123 Misc. Rep. 460 (205 N. Y. Supp. 761); *Fichette* v. *Cape Charles Bank,* 146 Va. 715 (132 S. E. 688, 691, 133 S. E. 492); *Hill's Admr.* v. *Hill,* 214 Ky. 63 (282 S. W. 760); *James* v. *Cullins,* 214 Ky. 179 (282 S. W. 1105, 294 S. W. 111).

"The finding of the jury in such case is merely of an advisory character upon issues of fact, and the verdict may be disregarded and findings contrary thereto made by the chancellor, or, if the verdict be adopted, it is still incumbent upon the chancellor to make findings." *Brichetto* v. *Raney,* 76 Cal. App. 232 (245 Pac. 235).

" * * verdict had no controlling force if it was an equity suit." *Order Ry. Conductors* v. *Jones,* 78 Colo. 80 (239 Pac. 882).

"The function of the jury was to enlighten the chancellor, and in the performance of that duty, to pass upon the credibility of the witnesses in the first instance. The court was not bound by the jury's findings, but was free to disregard them for any reason or without reason; * * " *Ayers* v. *Buswell,* 73 Mont. 518 (238 Pac. 591); *Rutherford* v. *Long & Co.,* 74 Mont. 420 (240 Pac. 821).

The intent of the legislature was to constitute marriage out of an agreement between a man and woman to be husband and wife when children were born as

a result of the cohabitation following such an agreement, notwithstanding the formal ceremony required by the marriage statutes of our state had not been observed. That was the full intent and purpose of said Chapter 269. If it had been the intent of the legislature to legitimate children born out of wedlock it could and would have said so in plan and unmistakable language.

It is not the duty of the court to determine the policy of the state as to marriages. A marriage contract is one peculiarly under the control of the legislature. The question presented by the instant appeal is not one of morals primarily, but one requiring the construction of a statute of the legislature. There is nothing about this statute that requires any other or different treatment than other acts of the legislature. The object of the court should always be to determine the intent of the legislature. To convert cohabitation as husband and wife into lewd and lascivious cohabitation is to do violence to the intent of the legislature as well as the language of the act. The rankest kind of judicial legislation is exercised when a statute prescribing the effect of marital cohabitation is changed so as to make lewd cohabitation a marriage. The legislature prescribed that cohabitation as husband and wife when children were born as a result thereof should constitute a marriage. The intent is plain that the statute was intended to legitimate the cohabitation of a man and woman under the belief that they were married to constitute a marriage when children are the result thereof. That is not only the intent as shown by the body of the act but also the title, which must be as broad as the act itself under our Constitution. Plaintiff's construction of the act is a complete change of the legislative intent. The con-

struction of the act demanded by plaintiff in effect substitutes lewd cohabitation for marital cohabitation. That is judicial legislation purely and simply. It might be more humane and merciful to legitimate all children born out of wedlock where the father may be identified, but that would require legislation. This court should not try to do that by construction.

The burden of proof in this suit is on the plaintiff. There is no direct evidence from either the plaintiff's mother or of John R. Brigham that they were married to each other. There is very slight evidence in the record that they ever cohabited as husband and wife. The testimony of plaintiff herself may be said to constitute such evidence. Plaintiff testified that her father and mother lived happily together for about five years after she was born. The record discloses that plaintiff's mother was married to a Mr. Liddy, who died in November, 1878. Plaintiff was born in October, 1879. In 1880 plaintiff's mother charged said Brigham, whom plaintiff claims to have been her father, with seduction. There is a copy of her complaint in the evidence in which she alleges directly that she was unmarried and that the said Brigham carnally knew and debauched her against her will to her damage. The record also shows that plaintiff's mother failed to sustain her allegations. The evidence is overwhelming also that during the period of five years referred to by plaintiff that her mother was operating a house of ill fame at the corner of Fourth and Alder Streets in the City of Portland. The record also shows that in 1883 plaintiff's mother was married to a man by the name of Thompson, without having been divorced from said Brigham. The evidence is overwhelming that during this same period the said Brigham was residing in a room in the Glisan

Block, Second and Ash Streets, Portland, at the time that plaintiff's mother was living at Fourth and Alder Streets and later at Third and Taylor. This is the period during which plaintiff testified that her mother and said Brigham were living together at the St. Charles Hotel and at the Esmond Hotel. Plaintiff testified that said Brigham told her that he and her mother were married in the State of California. Mrs. Britten, a witness for plaintiff, testified that the plaintiff was about a year old when said Brigham and her mother were at The Dalles and had the plaintiff with them; that she had just come from New York state and was introduced to them by her sister; that she inquired if the said Brigham and Mrs. Liddy, plaintiff's mother, were married, and Brigham held up the plaintiff in his arms and said, "Yes, see our marriage certificate," or spoke words to that effect.

The testimony of plaintiff's other witnesses, touching the question of the relation between her mother and said Brigham, follows. L. Comini testified that said Brigham referred to plaintiff's mother in 1893 as Mrs. Brigham. W. P. Swope, who knew said Brigham from 1888 to 1889, testified as follows:

"Q. When you knew Mr. Brigham, did you know him as a married man or an unmarried man? A. You couldn't tell; you never asked people—you never asked a man to pull out a marriage certificate when you met him in those days.

"Q. What was his general reputation as a bachelor? Was he supposed to have a family? A. He was a gay bachelor part of the time. * *

"Q. Who ran that rooming-house? A. I guess Mrs. Liddy or Lydy; we used to call her Liddy.

"Q. Where did Mr. Brigham live at that time? A. He lived there, I guess; that is the understanding I had. * *

125 Or.—32

"Q. Well, that is a fact, that he lived with her always, didn't he? A. Yes, I guess so. * *

"Q. Did he ever tell you he lived there? A. Certainly.

"Q. What was his reputation? A. His reputation was being with her for a number of years.

"Q. Being with her? A. Uh-huh; living with her.

"Q. Living with her,—what relation existing. A. I don't know what you would call it,—whether it was a meretricious relation or a marriage relation or what, —whatever you can call it."

Thomas A. Doud, who knew said Brigham since 1882 and knew his family in New York state, testified as follows:

"Q. What, if anything, did he say about his wife? A. Well, I asked him where the folks was; that is the way he come to tell me about the girl being in The Dalles; he said her mother was dead, and that the girl was living in The Dalles. * *

"Q. Did you know Mr. Brigham's reputation at that time regarding his married status; that is, was he known as a bachelor or a married man? A. Well, I couldn't answer that question; I don't know that. * *

"Q. Did you ever see his wife? A. No, I never did. * *

"Q. When Mr. Brigham had this conversation with you in 1924, of which you speak, did he mention any wife that he had? A. I don't know about the word— I couldn't say positively about the word 'wife'; that I asked him that question,—because I had always understood that he had a wife, but I asked him, I says, 'Where is the folks?' and he says that the wife is dead and the girl lives in The Dalles.

"Q. Do you recall definitely that he said that his wife was dead? A. I do."

J. F. O''Connor knew said Brigham since 1895 and testified as follows as to Brigham's reputation in 1895:

"Q. What was his reputation at that time as to his marital status? That is, was he known as a bachelor or a married man? A. Well, I supposed he was married; I had heard he had a daughter."

John A. McQuinn knew said Brigham from 1884. He testified as follows:

"Q. Did you ever know him as being a married man? A. Never said he was; never told me he was. * *

"Q. You knew that there was a common reputation that he was not a married man? A. Yes; I didn't think he was married, all right, as far as he was concerned; he never told me that he was, and I don't believe that he was married. * * From his conversation I would say it was more in the order of a mistress than a wife, really."

"Q. At that time (1906) did you know Mr. Brigham as a married man? A. No, he wasn't married; I don't think he was ever married."

Doctor W. A. Roberts testified that in 1893 the mother of plaintiff was living at Third and Taylor Streets, and regarding the reputation of said Brigham testified as follows:

"Q. At any rate, it wasn't at Third and Taylor, was it? A. I don't think so; not for him at that time; no, I never took any bill at Third and Taylor, to my recollection."

He also testified that said Brigham was living at that time near the police station. The police station is at Oak Street, near Second. Ash Street, where the other witnesses testified said Brigham lived, is north of Oak Street. The said witness Roberts was working for a dentist at that time as a student and collected the bills of his employer. This dentist had done work for the plaintiff and Roberts attempted to

collect their fees from the mother and then from said Brigham.

R. R. Morrill, who knew said Brigham since 1877, testified as follows:

"A. Well, he was a bachelor, and that she was his lady, or his woman; while they were not married, as a matter of fact they should be; now that's about what it means.

"Q. That they were living together as husband and wife, do you mean? A. No, I don't mean that. * *

"Q. What about Brigham's reputation as to being a bachelor or a married man? A. Why, I always understood he was a bachelor; I knew where he was rooming and knew where his store was. * * I never was up to his room, but I did know that he was a bachelor, and that he roomed—I first thought he roomed over the store, but the store was not on Second,—the store was on First; I couldn't—I couldn't positively swear that he roomed on Second and Ash; he did room upstairs, I thought over the store, but I got mixed on that room."

It is a rule of law that evidence of a reputation of marriage must be based on reputation contemporaneous with cohabitation. The birth of plaintiff in 1879 can hardly be the result of cohabitation of her parents in 1884 and thereafter: 38 C. J. 1324; L. R. A. 1915E, 39; 18 R. C. L. 429, § 57.

The evidence of all of the witnesses testifying for plaintiff, except Mrs. Britten, relates to the reputation a number of years after the birth of plaintiff, as is clearly shown from the excerpts in this opinion. Between the birth of plaintiff and the time of the reputation so testified to, plaintiff's mother had sued Brigham for seduction; plaintiff had been married and divorced from a man by the name of Thompson. Both of these events are indisputable and absolutely

contradictory of the claims made by plaintiff. In legal contemplation it was impossible for plaintiff to have been born as the result of cohabitation between plaintiff's mother and said Brigham within the meaning of the statute. The statute is plain that the birth must be the result of cohabitation as husband and wife. There is no evidence at all in the record anywhere that plaintiff's mother and said Brigham cohabited as husband and wife during 1878 or 1879. The cohabitation must have been during that period. There is the sworn testimony of plaintiff's mother that they did not so cohabit. She never at any time claimed to be the wife of said Brigham. In her action for seduction she charges the act was committed by force, not under a promise of marriage. A short time before her death she wrote a letter to said Brigham warning him of the designs of her daughter, the plaintiff. The only letters, copies of which were kept by plaintiff, are two letters written after the death of her mother. To say the least, suspicion attaches to the motives of plaintiff in keeping copies of these letters, and this suspicion is not allayed by the very endearing terms used by plaintiff in addressing said Brigham. Both letters seem very extravagant and not natural. Brigham himself denied many times that plaintiff was his daughter and there is other evidence tending to support his denials, but we do not place our decision on the ground that plaintiff is not his daughter. Our position is that in order for her to come within the statute she must have been begotten by her parents while cohabiting as husband and wife.

It will thus be seen that the evidence in behalf of plaintiff herself is far from being uniform to the effect that plaintiff's mother and said Brigham were living together or cohabiting as husband and wife.

None of those witnesses testified that they were so cohabiting prior to the birth of plaintiff. Said Chapter 269 expressly prescribes to the effect that the children born after the beginning of said cohabitation are legitimated. None of plaintiff's witnesses go that far. They do not even concur that the relation of plaintiff's mother and said Brigham was reputed to be that of husband and wife.

It is earnestly contended by plaintiff that the evidence offered in behalf of defendants is negative evidence. She urges that their testimony is simply to the effect that the reputation of said Brigham and plaintiff's mother was that they were not married. The evidence is very different from that. It shows positively the residence of these parties in the same city; that they did not live together; that they were not cohabiting as husband and wife; that any relation of that nature between them was that of man and mistress; that their relation was meretricious.

Plaintiff insists in her supplemental brief that her testimony to the effect that her father and mother lived together happily as man and wife for about five years is not contradicted and is corroborated by all of the evidence. Her evidence in that regard, in our judgment, is not worthy of belief at all. She was born in 1879. The five years referred to would cover a period from 1879 to 1884. In 1880 plaintiff's mother sued said Brigham for seduction. Plaintiff's mother, under oath, made the following statements in her complaint:

"That on the twenty-second day of September, A. D. 1878, she was, ever since has been, and is an unmarried woman over twenty-one years of age. That on the said twenty-second day of September, 1878, at Portland, Multnomah County, Oregon, the

said defendant did make an assault upon plaintiff, and with force and arms did wickedly, maliciously and wilfully seduce, debauch and carnally know the said plaintiff, and did, on divers days and times between the said date last named and the twentieth day of January, A. D. 1879, at Portland, Oregon, aforesaid, make divers other assaults upon, and maliciously, wickedly and wilfully carnally know plaintiff. * * *''

During the period plaintiff's mother and said Brigham must have cohabited in order for plaintiff to have been the result of said cohabitation, plaintiff's mother solemnly alleged, under oath:

"That on the twenty-second day of September, A. D. 1878, she was, ever since has been, and is an unmarried woman over twenty-one years of age."

This sentence is directly opposed to any kind of marriage between the parties. Plaintiff asserts in the face of this indisputable record that her mother and said Brigham cohabited *as husband and wife* during that same period. There is as much difference between their cohabitation during said period and marital cohabitation as there is between vice and virtue.

Plaintiff also testified that her mother and said Brigham cohabited as husband and wife for more than a year prior to her birth. It would be impossible for them to have done so because her mother's former husband died within less than a year prior to her birth and it would have been impossible for her mother to have cohabited with said Brigham as his wife when her husband was living and undivorced. Otherwise plaintiff's mother would have been married while her former husband was living: *Klipfel's Estate* v. *Klipfel*, 41 Colo. 40, 49 (92 Pac. 26, 124 Am. St. Rep. 96). It is also proved beyond dispute in the evidence that in 1883 plaintiff's mother married a

man by the name of Thompson without having been divorced from said Brigham.

These citations are inserted herein to show the absurdity and extravagance of the claims of plaintiff in her supplemental brief. We may concede that said Brigham acknowledged the plaintiff to be his daughter. There is considerable evidence to that effect. That is not sufficient to make a marriage out of the meretricious relations between her mother and said Brigham under Chapter 269. The birth of the plaintiff must have been the result of marital relations between her mother and said Brigham in order to bring plaintiff under the provisions of said Chapter 269. There is no substantial evidence of such cohabitation.

Almost a score of witnesses called for defendants, who had known both Brigham and Mrs. Liddy, plaintiff's mother, during the period it is claimed they lived together, testified positvely that they were not living together; stated from their own knowledge the business both parties were engaged in, and that during all of said time said Brigham was known as a bachelor among his acquaintances.

The testimony of plaintiff is not convincing. She was too young to have known anything about the relation between the parties during the period she claims her mother was living with Brigham as his wife. The very fact that she testified that they lived happily together during those five years as husband and wife, in the face of the indisputable record of the action instituted by her mother against Brigham for seduction in 1880, and in the face of the record that during that same period her mother was married to one Thompson, destroys what little value her testimony has in that behalf.

There is no evidence of that kind to be found in the record in the instant case. A presumption of marriage can arise on the proven facts of cohabitation and reputation when they unite and are open, public and uniform: *Osborne* v. *Ramsey,* 191 Fed. 114 (11 C. C. A. 594); *Callery's Estate,* 226 Pa. 469 (75 Atl. 672); Jones' Com. on Ev. (2 ed.), 99–101, § 53; 1 Bishop on Marriage and Divorce (5 ed.), §§ 500–506.

"Common repute, to be significant, should be uniform." *Pegg* v. *Pegg,* 138 Iowa, 572 (115 N. W. 1027); *Schwingle* v. *Keifer* (Tex. Civ. App.), 135 S. W. 194, 105 Tex. 609 (153 S. W. 1132); *Weatherall* v. *Weatherall,* 63 Wash. 526 (115 Pac. 1078).

Marriage may not be proven by partial or divided reputation: *In re Boyington's Estate,* 157 Iowa, 467 (137 N. W. 949); *Taylor* v. *Taylor,* 10 Colo. App. 303 (50 Pac. 1049); *State* v. *Wilson,* 5 Penne. (Del.) 77 (62 Atl. 227); *Eldred* v. *Eldred,* 97 Va. 606 (34 S. E. 477); *Weindenhoft* v. *Primm,* 16 Wyo. 340 (94 Pac. 453); *Klipfel's Estate* v. *Klipfel,* 41 Colo. 40 (92 Pac. 26, 124 Am. St. Rep. 96); 38 C. J. 1324.

"It may be inferred that the relation is meretricious where the man acknowledges the woman as his wife only when necessary to continue the deception or when among her friends and relatives, and not among his relatives and business acquaintances. *Laurence* v. *Laurence,* 164 Ill. 367 (45 N. E. 1071); 38 C. J. 1325, note 66; *Nye* v. *State,* 77 Tex. Cr. 389 (179 S. W. 100); *Haley* v. *Goodheart,* 58 N. J. Eq. 368 (44 Atl. 193, 196); *McBean* v. *McBean,* 37 Or. 195 (61 Pac. 418).

"The presumption of marriage arising from marital cohabitation and repute is not conclusive, but is open to rebuttal, and if it appears that there was in fact no marriage between the parties either by ceremony or by informal contract the presumption is dis-

pelled." 38 C. J. 1339; 18 R. C. L. 434; *In re Baldwin*, 162 Cal. 471, 476 (123 Pac. 267); *McBean* v. *McBean*, 37 Or. 195 (61 Pac. 418); Jones' Com. of Ev. (2 ed.), 2094.

Many other questions were ably discussed at the oral argument and exhaustively presented in the several briefs filed by both sides. In order for plaintiff to recover it was necessary for her to prove that her mother and said Brigham cohabited together as husband and wife in the State of Oregon for one year. It was not necessary under the statute that such cohabitation should have existed a year prior to the birth of plaintiff. That statement appearing in the original opinion was a mere slip of the pen. It is our belief that plaintiff must have proved an agreement between her mother and said Brigham to live as husband and wife in order for her to come within said Chapter 269. She might have proved this necessary fact by the admission of her mother and said Brigham. She might have proved it by witnesses who heard them make such an agreement. She might have proved it by their cohabitation and holding themselves out as married to the public, to their neighbors, their friends and their relatives. She has wholly failed to prove such an agreement or the cohabitation of her mother and Brigham as husband and wife. Giving to plaintiff the full value of her testimony, the most it establishes is that said Brigham was her father. That is not sufficient. It is necessary not only for him to have been her father, but also that she was begotten as a result of her mother and said Brigham cohabiting as husband and wife.

"In case a man and woman * * have cohabited * * as husband and wife * * and children shall be living

as a result of said relation, said relation'' is a valid marriage: Chapter 269, Laws 1925.

The decree of the Circuit Court should be affirmed.

AFFIRMED.

BELT and ROSSMAN, JJ., concur.